**Vivian H. FIKE and Robert Wilson, Plaintiffs,**

v.

**Thomas L. RUGER, Eris Marie Scott, as Administratrix of the Estate of Virgil Scott, Jr., Descomp, Inc., Data Controls North, Inc., and Del–Chapel Associates, Defendants.**

C.A. No. 16791.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 19, 1999.
Decided: Nov. 19, 1999.

---

4. *Malcom v. Chrysler Corp.,* Del.Super., 255 A.2d 706, 710 (1969).

5. *Id. Accord M.A. Hartnett, Inc. v. Coleman,* Del.Supr., 226 A.2d 910, 913 (1967).

Jeffrey S. Goddess, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, for Plaintiffs.

Jeoffrey L. Burtch, Gregory J. Weinig, of Cooch and Taylor, Wilmington, Delaware, for Defendants.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

This action concerns a joint venture formed in 1979 to purchase, hold and develop certain commercial real property. A written joint venture agreement was executed in 1981. In 1998, after years of losses, the joint venture agreed to sell the property. Seeking to participate in the distribution of sale proceeds, two minority members of the joint venture filed this complaint against their co-venturers and the joint venture itself. The complaint asserts claims for an accounting (Count I) and for declaratory and injunctive relief (Count II).

The principal focus of the action is the enforceability of several loan agreements originating in 1981 between the joint venture and certain of its members. If those agreements are enforced, the plaintiffs will not be entitled to receive any distribution of sale proceeds. Rather, the entirety of those proceeds will be used to repay the principal and interest obligations on the loans authorized by the agreements. If, instead, the funds borrowed over the years since 1981 are treated as non-interest bearing capital contributions, plaintiffs will be entitled, under the terms of the joint venture agreement, to some distribution of sale proceeds.

On May 14, 1999, plaintiffs filed a motion for partial summary judgment seeking a declaration that funds advanced should be capitalized. On August 2, 1999, the defendants cross-moved seeking to declare the enforceability of the loans. Defendants also assert that the plaintiffs' claims are time barred, either by the statute of limitations or by laches.

I conclude that the claims related to the loans arose at the time the loans were made and that those claims are now barred by the three-year statute of limitations. Thus, although plaintiffs may now have a right to an accounting in connection with the impending dissolution and winding up of the joint venture, they may not, in connection with that accounting, litigate over the validity of the 18–year–old loan agreements. Because it is conceded that if (as I have found) claims about the loans are time-barred there are no remaining funds about which to account, I will enter

judgment on the complaint in favor of defendants.

## II. FACTUAL BACKGROUND

### A. The Parties

Plaintiffs are Vivian H. Fike and Robert J. Wilson, two members of Del–Chapel Associates, a Delaware joint venture. Together they own 13.5% of the equity interest in the joint venture. They allege that the five defendants, Thomas L. Ruger, Eris Marie Scott, as Administratrix of the estate of Virgil Scott, Jr., Descomp, Inc., Data Controls North, Inc. (all members of the joint venture), and Del–Chapel Associates, engaged in and failed to disclose a policy of self-interested borrowing transactions that diverted revenues away from the business and deprived the plaintiffs of any return on their investments.

### B. The Joint Venture Agreement

During the 1970s, Fike, a realtor, was the leasing manager for the property at the intersection of Main and South Chapel Streets in Newark, Delaware. In early 1979, she agreed with defendants Ruger and Scott to enter into a joint venture to acquire the property. The joint venturers financed the purchase by assuming the existing mortgage and by obtaining loans (evidenced by notes bearing 12% interest) from Descomp and Data Controls, corporations controlled by Ruger and Scott.

On January 13, 1981, the Del–Chapel Associates Joint Venture Agreement (the "JVA") was signed, applying retroactively to the property purchase date. Although Fike originally thought that the joint venture would be owned equally by Scott, Ruger and herself, they agreed, as evidenced by the terms of the JVA, to the following ownership structure: 25% to each of Descomp and Data, 11.5% to John Greenwell, the founder and former owner of Data Controls, 1% to Robert Wilson, the on-site property supervisor, and 12.5% to each of Fike, Ruger and Scott. Descomp and Data Controls, which provided most of the joint venture's initial funding requirements, took their equity in lieu of the 12% notes.

Unlike a common law general partnership in which each partner may at any time withdraw and cause a dissolution, Section 18(a) of the JVA requires the written consent of joint venturers owning 75% of the joint venture interests to authorize a dissolution. If not sooner dissolved, Section 18(d) provides that the joint venture will not terminate until all property owned by it is sold and a final distribution made in accordance with the terms of the JVA.

The JVA provides that day-to-day decisions be made by a majority of Fike, Scott and Ruger and that policy decisions, including borrowings by the joint venture, require written approval by a majority of the venturers, defined in the JVA as "Venturers holding more than fifty percent (50%) of the aggregate Joint Venture Interests held by all of the Venturers." Section 5 of the JVA authorizes Del–Chapel to borrow money in the future from outside sources and to pay prevailing interest rates. Section 5 also contemplates the possibility of loans from the joint venturers but specifically states that none of them were under an obligation to make additional loans or advances.

Finally, in keeping with its indefinite term and the inability of the joint venturers owning less than 75% of the joint venture interest to cause a dissolution, the JVA provides for a dispute resolution mechanism that is available without regard to the dissolution of the joint venture. Section 19(d) states that "[a]ny dispute or controversy under this Agreement shall, upon the request of any party involved, be determined and settled solely by binding arbitration in the State of Delaware...." Delaware law governs the JVA.

### C. The 1981 Borrowing Authorization

On the day the JVA was signed, Ruger, Scott and Greenwell (in their personal capacities and on behalf of Descomp and

Data) signed an agreement authorizing Del–Chapel to borrow further amounts from Descomp and Data (the "1981 Borrowing Authorization"). This agreement provided that any such amounts loaned would be credited to Descomp's and Data's respective capital accounts and would accrue interest at the prevailing prime rate plus 2%, compounded annually. The 1981 Borrowing Authorization also purported to apply retroactively to all prior funds advanced by Descomp and Data.[1] The plaintiffs neither signed that authorization nor were advised of its existence or terms. Descomp and Data thereafter loaned substantial amounts of money to the joint venture.

### D. Plaintiffs' Knowledge of the State of Del–Chapel's Finances

The record is replete with information showing that the poor state of Del–Chapel's financial picture was well known to plaintiffs beginning in the mid- to late–1980s. By the mid–1980s, several tenants departed and the buildings on the property began to fall into disrepair. In 1985, Del–Chapel sold a parcel of the property for $147,000. Another was sold in 1987, this time for $280,000. Fike signed documents in connections with these transactions. Wilson was also aware of these sales. Neither received any distribution of proceeds.

In 1985, Fike asked for and received copies of Del–Chapel's tax returns for 1979—1984, Del–Chapel's audited financial statements for the years 1979 through 1983, and a copy of an unaudited profit/loss statement and balance sheet for the year ended December 31, 1984. Fike hired an accountant to review those materials.

On July 4, 1987, an article appeared in the daily newspaper of general circulation in northern Delaware discussing the joint venture's woes, including the existence of over $50,000 in unpaid taxes. The article reported that the partners' eight year old

"dream project has fallen victim to financial problems and disagreements among the owners." The article noted that several parcels had already been sold to settle those debts and that other parcels were on the block.

In 1987, Fike hired a lawyer who wrote to Ruger and demanded an accounting "from the other partners of all monies which have been received by the partnership, all business which has been conducted by the partnership and, in general, true and full and correct information of all things that have affected the partnership since its inception." This letter went on to state that, if satisfactory information is not forthcoming, Fike "is disposed to filing a petition in the Court of Chancery seeking injunctive relief and, additionally, seeking an accounting."

Responding to this letter, Ruger and Scott sent a letter to Fike, dated September 23, 1987, offering to buy out her 12.5% interest in Del–Chapel for $157,000. This amount was derived, roughly, by calculating 12.5% of the difference between the assumed value of the property ($5,200,000) and "the $3,935,000 owed to Descomp, Inc. and Data Controls/North, Inc." This letter also stated that interest on the nearly $4 million owed Descomp and Data was accumulating at a rate of $39,000 per month (which rate was "climbing"), and that, as a consequence, the value of Fike's 12.5% equity interest was eroding by at least $4,875 per month. The letter warned Fike that "it won't take many more months before most of the equity would be gone." Despite some subsequent dialogue, no buyout agreement was reached.

### E. The Correspondence Following the Buyout Letter Makes Clear that Fike Knew About the Defendants' Alleged Misdeeds

Although Fike's later correspondence with Ruger did not lead to a buyout, these

---

1. The defendants failed, in their briefs and at oral argument, to square the retroactive aspect of the 1981 Borrowing Authorization with the capital allocations found in the JVA. As discussed below, this fact does not change the outcome.

letters establish that Fike was aware of significant problems with the business relationship. A December 15, 1987 letter through her then attorney indicated Fike's intent to conduct an audit, as contemplated by the JVA, and noted that if Ruger did not provide a prompt response, "Mrs. Fike is disposed to invoking the provisions of paragraph 19(d), namely arbitration."

On July 12, 1988, Fike's next attorney, Samuel Fabrizzio, sent another letter to Ruger's attorney, demanding access to the joint venture's books and records, including tax returns and other documents recording Del–Chapel's finances. Mr. Fabrizzio stated that failure to provide the requested information would result in "an appropriate accounting proceeding in Chancery Court" to obtain an order compelling disclosure of the documents.

About three weeks later, Ruger's attorney responded by supplying the requested information and stating that "all of my client's records are available for you and your client's review with an accountant if necessary upon scheduled notice" at Descomp's offices. A follow-up letter by Ruger's attorney, dated October 21, 1988, indicates that neither Fike nor her attorney acted on the offer.

### F. The 1992 Borrowing Authorization

In late 1992, Del–Chapel entered into a second borrowing authorization much like the 1981 Borrowing Authorization, except that it contemplated loans from Ruger and Scott instead of loans from Descomp and Data. Again, funds forwarded would increase the "lenders"' capital account, accruing compound interest at prime plus 2% and enjoying first priority. Neither Fike nor Wilson signed this borrowing authorization.

### G. Fike Files Lawsuits in Superior Court and Federal District Court

In 1993, Fike filed suit against the accountant she had hired in 1987 to review and audit Del–Chapel's tax returns and other financial information. She recovered a judgment against him for a portion of his fees.

In June 1994, Fike filed an action in the United States District Court for the District of Delaware against Ruger, Scott, Descomp and Data, alleging violations of the federal RICO statute and pending thereto state law claims for breach of fiduciary duty. Most relevant to my analysis is Count VII, claiming in pertinent part:

> Defendants conspired among themselves to divert partnership funds to give the appearance corporate partners Descomp, Inc and Data Controls North, Inc. were making major contributions to the partnership in the form of loans. Upon dissolution of the partnership[,] payment of loans to Data Controls North, Inc. and Descomp, Inc. would require the remaining partners to give up their interest to satisfy the loan. Defendants, Ruger and Scott, are the principal shareholders in defendants Data Controls North, Inc. and Descomp, Inc. The diversion of partnership funds was fraud in that it diverted the true financial picture of the partnership.

This aspect of Fike's federal complaint is essentially the same as the claims included in Count II of the instant complaint. In 1995, Judge McKelvie dismissed the RICO-based claims, also dismissing Fike's state law claims for lack of subject matter jurisdiction. *Fike v. Ruger*, C.A. No. 94–314–RPM, (D.Del. February 28, 1995) (Order). During oral argument, the district court advised Fike, through her then counsel, that while she could not recover under the RICO statute, she could refile her state law claims in the appropriate court. Judge McKelvie also noted that while the statute of limitations might not provide a complete defense to such equity-based actions, the plaintiffs might still need to address a laches claim. Despite this advice, no action was filed

in this Court until November 19, 1998, more than three years later.[2]

## H. Distributing the Proceeds From the Pending Sale of the Joint Venture's Remaining Property

On December 18, 1998, Del–Chapel Associates entered into an agreement to sell its remaining property for a purchase price of $6,073,675. Under the JVA and the Borrowing Authorizations, Del–Chapel will distribute the sale proceeds first to repay the principal and accrued interest due on the loans made by Descomp, Data, Ruger and Scott. The amount owed on those loans is expected to exceed the sale proceeds. Thus, the only way for the plaintiffs to receive any part of the sale proceeds is by successfully challenging the validity of the loans.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the moving party shows that there are no genuine issues as to material facts and that the moving party is entitled to judgment as a matter of law. *Haft v. Haft,* Del. Ch., 671 A.2d 413, 415 (1995) (*citing Burkhart v. Davies,* Del.Supr., 602 A.2d 56, 58–59 (1991)). The Court views the evidence in the light most favorable to the non-moving party, accepting as true all evidence uncontroverted by the record. *See Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114, 1115 (1979).

 In the context of cross-motions for summary judgment, neither of the cross-movants necessarily concedes the absence of material factual disputes that may preclude summary judgment in favor of the other party. *United Vanguard Fund, Inc. v. TakeCare, Inc.,* Del.Supr., 693 A.2d 1076, 1079 (1997). Finally, the Court may,

in its discretion, deny summary judgment if it finds that "a more thorough development of the record would clarify the law or its application." *In re Dairy Mart Convenience Stores, Inc.,* Del. Ch., C.A. No. 14713, mem. op. at 31, 1999 WL 350473, Chandler, C. (May 24, 1999) (citing *Brown,* 403 A.2d at 1115).

### B. Are the Plaintiffs' Claims Barred by the Statute of Limitations or the Doctrine of Laches?

#### 1. Statute of Limitations

 Under Delaware law, a three-year statute of limitations applies to claims for breach of contract or breach of fiduciary duty. 10 *Del. C.* § 8106. While this Court is not specifically bound to apply the statute of limitations, "equity follows the law and, in appropriate circumstances, applies the statute of limitations by analogy, denying relief when claims are brought after the analogous statutory period." *Merck & Co., Inc. v. SmithKline Beecham Pharms. Co.,* Del. Ch., C.A. No. 15443, mem. op. at 100, 1999 WL 669354, Chandler, C. (Aug. 5, 1999); *see also United States Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497, 502 (1996). "[W]here the relief sought in equity in a so-called complaint for an accounting is actually the mere recovery of money, as is the case here," the case is analogous to an action for monetary damages. *Artesian Water Co. v. Lynch,* Del. Ch., 283 A.2d 690, 692 (1971).

#### 2. Time of Accrual and Tolling

 A cause of action accrues at the moment of the wrongful act, even if the plaintiff is ignorant of the wrong. *In re Dean Witter Partnership Litig.,* C.A. No. 14816, mem. op. at 11, 1998 WL 442456, Chandler, C. (July 17, 1998). The plain-

---

**2.** A variety of factors appear to have contributed to this lengthy delay. Fike's then attorney became the subject of unrelated disciplinary proceedings and, thus, ceased rep-

resenting her. Fike also experienced health problems. None of the delay is attributable to anything done by the defendants.

tiffs' claims, first asserted in this Court in November 1998, relate to matters occurring between 1981 and 1992. The statute of limitations therefore long ago barred these actions, unless some basis exists to toll the running of that statute. *Merck & Co.*, mem. op. at 101. The plaintiffs bear the burden of proving that tolling is available. *United States Cellular*, 677 A.2d at 504.

Chancellor Chandler recently explained that "the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury." *Dean Witter*, mem. op. at 20. The plaintiffs must therefore point to facts showing that they were not on inquiry notice before November 19, 1995.

█ To begin with, there is no basis in the record for tolling the limitations period on account of fraudulent concealment of the alleged wrong. This is so because there has been no showing of "an affirmative act of concealment by a defendant." *Dean Witter*, mem. op. at 14. On the contrary, Ruger offered to Fike (in his letter dated August 3, 1988) the opportunity to review Del–Chapel's books and records on-site at Descomp's offices. For his part, Wilson never even asked to inspect Del–Chapel's books. Also, even if the defendants initially executed the Borrowing Authorizations in a secretive manner, there is no showing that they affirmatively concealed the loans made by Descomp and Data.[3]

█ The theory of equitable tolling will stop the running of the limitations period "for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." *Dean Witter*, mem. op. at 15. Although the plaintiffs may have been

right to rely on the good faith of their co-venturers, tolling will only last until they knew or had reason to know of the facts constituting the alleged wrong. *Id.* As discussed below, Fike knew of the facts constituting the wrong and Wilson had a strong enough basis to suspect mismanagement or wrongdoing that he could not reasonably rely on his partners' good faith.

### 3. Was Fike on Inquiry Notice?

█ The facts discussed at pages 258–60 of this opinion, alone or in combination, establish that Fike was on inquiry notice for longer than three years prior to this action. While the plaintiffs argue that the 1987 buyout letter was not "the best example" that Descomp and Data Controls were being paid interest, they concede that the letter was the *earliest* disclosure of that fact. The letters sent on behalf of Fike in the ensuing months make clear that she understood the potential dispute and that a claim against her co-venturers was an option. The July 12, 1988 letter even indicates a willingness to file an accounting action in this Court.

Moreover, Fike had actual knowledge of her claims for well over three years before bringing suit. Fike filed her federal court RICO action in 1994 and included therein the same state law breach of duty claims she presents in this case. That action was dismissed in February of 1995 and no new action filed until late–1998.

In sum, I find that Fike was on inquiry notice 11 years before bringing this suit and had actual knowledge of the nature of the alleged wrongs for at least five years before filing this complaint. Her claim is therefore barred by the statute of limitations.

### 4. Are Wilson's Claims Also Barred?

█ Unlike Fike, there is no direct evidence that Wilson was aware that Des-

---

**3.** Plaintiffs note that only during discovery in this case were the Borrowing Authorizations actually shown to the plaintiffs. Even if this fact bears on the defendants' state of mind, it carries no weight in showing fraudulent concealment because the loans themselves were not concealed and put Fike, at least, on notice of a potential claim.

comp and Data were lending large sums of money to Del–Chapel. The evidence (including Wilson's own affidavits) shows that he was present on a daily basis at the Del–Chapel property and knew that things were going badly. For instance, he knew "particularly after 1985" that the property was not generating sufficient income to meet expenses and that it was "slipping into disrepair." He also understood that "there had to be cash infusions as of and after 1987" but had no "sense or familiarity as to the size of any shortfalls, whether infusions were being treated as investments or loans, and, if loans, what interest rate was being charged."

It may be that this limited state of awareness is enough to establish inquiry notice on Wilson's part. Certainly, it is the same sort of information that caused Fike to seek information from the joint venture. In any case, I conclude that Wilson's claim is barred because his lack of knowledge was due to his failure to exercise his right to obtain information, as provided by the JVA and by law. "Equity aids the vigilant, not those who slumber on their rights." *Adams v. Jankouskas*, Del. Supr., 452 A.2d 148, 157 (1982).

Wilson, however trusting he may have been that his partners would act in good faith, had some obligation to be "reasonably attentive" to his investment interests. *Dean Witter*, mem. op. at 23. *Dean Witter* involved a dispute between a class of limited partner investors in several real estate limited partnerships and the defendant general partners. Chancellor Chandler concluded that even limited partners are required to be "reasonably attentive" to their investment interests. This standard should apply with greater force to Wilson,

who was a joint venturer (or general partner) of Del–Chapel.

The JVA granted each of the joint venturers the right to inspect and audit Del–Chapel's books and records. While Wilson's 1% interest did not give him the power to prevent decisions approved by the holders of a majority of the joint venture's ownership, his right to inspect and audit the books allowed him to ensure that his partners were not abusing their powers. The record is devoid of any evidence suggesting that Wilson ever sought to exercise his rights as a joint venturer to monitor the operations of the joint venture or his partners' decisions. It follows that Wilson failed to be reasonably attentive to his investment interests.[4]

I also find that the defendants would suffer substantial prejudice if I were to permit Wilson's claim to proceed. The deaths of Virgil Scott and Clifton Whittaker, Del–Chapel's long time accountant, plainly establish prejudice to the defendants because both Scott and Whittaker would have been important witnesses for the defendants. *Cooch v. Grier*, Del. Ch., 59 A.2d 282, 287 (1948).

For these reasons, I find that both Fike's and Wilson's claims are barred by laches.[5]

## C. Are Plaintiffs' Claims Nevertheless Proper in the Context of an Accounting?

Finally, plaintiffs seek to avoid the statute of limitations or laches defense by characterizing their claims as ones for a settlement of partnership accounts upon dissolution. They cite to Section 43 of the Delaware Uniform Partnership Law

---

4. Finally, I note that Wilson does not deny knowledge or awareness of the 1994 lawsuit between Fike and the defendants. *See Dean Witter,* mem. op. at 17–21 (taking for granted that an article published in the *Wall Street Journal* relating to the plaintiffs' claims put them on notice).

5. Unlike a statute of limitations, which inherently focuses on the passage of time, laches depends on more than a showing of delay. A "party must also prove that he has suffered actual prejudice or injury as a result of the plaintiff's unreasonable delay." Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 11–5(b)(3) (1998).

("DUPL"), 6 *Del. C.* § 1543, which provides that "[t]he right to an account of his interest shall accrue to any partner . . . at the date of dissolution, in the absence of any agreement to the contrary." 6 *Del. C.* § 1543. Plaintiffs also cite Russell G. Donaldson, Annotation, *When Statute of Limitations Commences to Run on Right of Partnership Accounting,* 44 ALR 4th 678 (1986), as supporting the conclusion that their claims relating to the Borrowing Authorizations and the loans entered into thereunder are not time-barred but may be brought as part of an action for accounting upon dissolution.[6] For the purposes of this discussion, I will assume that the default provisions of DUPL govern Del–Chapel to the extent not inconsistent with the JVA.

I reject this argument for several reasons related to the form and structure of Del–Chapel. First, the termination provisions of the JVA are distinctly different than those found in a general partnership, where each partner may ordinarily withdraw at any time and cause an event of dissolution. The joint venturers (or partners) of Del–Chapel individually have no right to withdraw and no power to cause an event of dissolution. Thus, Del–Chapel has greater "entity" characteristics than a partnership. Second, the JVA expressly provides a mechanism for resolution by arbitration of disputes arising under it that is not dependent upon the happening of an event of dissolution. In other words, Fike and Wilson had both the right to a resolution of their claims relating to the Borrow-

ing Authorizations or the loans made under them and the ability to obtain such a resolution at any time, notwithstanding their inability to dissolve the enterprise and seek an accounting. In the circumstances, little or no purpose would be served by adopting a rule that allows Del–Chapel's joint venturers to sleep on their rights until an event of dissolution or termination occurs and the default provisions of the partnership statute give them a right to an accounting.

Moreover, Sections 21 and 22 of DUPL [7] can be read consistently with this result. At common law, the general rule was that actions for accounting should be brought post-dissolution. *See* Alan R. Bromberg & Larry E. Ribstein, *Bromberg and Ribstein on Partnership,* § 6.08(b), at 6–172 (1999). Because the common law rule placed partners in· the predicament of either causing a dissolution to resolve disputes or continuing the partnership despite a cloud of conflict and uncertainty hanging over it, the drafters of the Uniform Partnership Act ("UPA") included Section 22, specifically authorizing accounting actions prior to dissolution. *Id.*

 It would seem a natural development that, once such actions were permitted, they should be regarded as "accruing" for purposes of statutes of limitations at the time of their occurrence, even in the context of partnerships subject to dissolution by a partner's withdrawal. That position was not universally adopted by courts interpreting the UPA,[8] but it has now been

---

6. Although not material to my analysis, I note that under the plaintiffs' theory, this cause of action has not yet actually accrued, in that none of the events triggering dissolution under the JVA have occurred.

7. Section 21 (6 *Del. C.* § 1521) is entitled "Partner accountable as a fiduciary" and provides that every partner "must account to the partnership for any benefit, and hold as trustee for it any profits, derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property."

Section 22 of DUPL (6 *Del. C.* § 1522) gives a partner the right to a formal accounting as to partnership affairs: (1) if he is wrongfully excluded from the partnership business by his copartners; (2) if the right to an accounting is granted by the agreement; (3) [a]s provided by [Section 21] of this title; (4) when such an action is just and reasonable.

8. *See, e.g., Revised Uniform Partnership Act (1996),* § *405(c),* Comment 4 (stating that under the revised law, "claims barred by a statute of limitations are not revived by reason of the partner's right to an accounting upon dissolution, *as they were under the UPA."* (em-

codified in § 405(c) of the Revised Uniform Partnership Act ("RUPA"), which states that "[t]he accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law. A right to an accounting upon a dissolution and winding up *does not revive a claim barred by law.*" (emphasis added). Thus, it is clear under RUPA that a right of action arising during the life of a partnership is not revived merely because a dissolution occurs and a separate right to an accounting on dissolution arises.

 Although the issue is not squarely presented due to the presence of the arbitration provision in the JVA and the signal structural differences between Del–Chapel and a general partnership, I conclude, as an alternative ground of decision, that Fike's and Wilson's *right* to bring an action under 6 *Del. C.* § 1522 created an *obligation* to do so in a timely manner, or else to risk forfeiture of their claims, even in a post-dissolution accounting under 6 *Del. C.* § 1543. This reading finds some support in cases reported from other jurisdictions. For example, the Kansas Supreme Court has held that while UPA § 43 provides that an action for accounting accrues upon dissolution, when an accounting is authorized by UPA § 22, that section governs and provides an exception to the § 43 accrual rule. *High Plains Oil Exploration, Inc. v. C.C. & S. Oil Operations, Inc.*, No. 61,604, 1988 Kan. LEXIS 136 (Kan. Jan. 3, 1988).

Finally the plaintiffs cite *In re Dean v. Meyer*, Del. Ch., C.A. No. 15390, 1997 WL 525754, Chandler, C. (July 7, 1997), for the proposition that any suit by Fike or Wilson before now would have been unripe. I cannot agree. In that case, Chancellor Chandler was asked to issue a declaration as to the rights and obligations among limited partners in relation to certain outstanding demand notes of the partnership that would become due and owing if the general partner pursued a particular strategy of selling certain partnership assets. The Chancellor held that the matter was not ripe for decision because there were no allegations "that the demand notes are currently due, that any defendant has failed to meet its existing obligations under the notes, or that the plaintiff is currently entitled to receive contributions from the defendants." *Id.* at 2. This case is readily distinguishable in that plaintiffs complain about the very existence and terms of the Borrowing Authorizations and the loans made thereunder. It is the current obligations of Del–Chapel on those loans that form the basis of plaintiffs' claims. Those claims were ripe for adjudication when the first loans were made.

## IV. CONCLUSION

For all of the foregoing reasons, the defendants' motion for summary judgment is GRANTED, and the plaintiffs' motion for summary judgment is DENIED.

phasis added)); *Couri v. Couri*, 95 Ill.2d 91, 69 Ill.Dec. 117, 447 N.E.2d 334 (1983) (refusing to apply laches in a post-dissolution accounting, because failure to demand a partnership accounting while the partnership continued would not give rise to laches).