# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

DAVIS, BOWEN & FRIEDEL, INC., )
)
        Plaintiff, )
)    C.A. No.: N14C-05-021 AML
        v. )
)
)
BERNARD DISABATINO, )
)
        Defendant. )

Submitted: September 7, 2016
Decided: December 27, 2016

## <u>MEMORANDUM OPINION</u>

Patrick J. Scanlon, Esquire and Darlene Wyatt Blythe, Esquire, LAW OFFICES OF PATRICK SCANLON, P.A., Wilmington, Delaware; *Attorneys for Davis, Bowen & Friedel, Inc.*

Leo John Ramunno, Esquire, LEO JOHN RAMUNNO, ATTORNEY AT LAW, Wilmington, Delaware; *Attorney for Bernard DiSabatino.*

**LeGROW, J.**

This is a breach of contract case stemming from four separate contracts through which the defendant retained the plaintiff to assist in developing four distinct pieces of real estate. The plaintiff requests judgment in its favor in the amount of $180,484.86, plus interest, attorneys' fees, and court costs.[1] The key question in this case is one of timeliness: did the plaintiff's claims accrue when the defendant stopped paying or were the plaintiff's damages uncertain until the contracts were terminated? I conclude the plaintiff could ascertain its damages at the time the invoices were not paid, and I therefore award damages only for those invoices that became past due no more than three years before the complaint was filed.

## FACTUAL AND PROCEDURAL HISTORY

These are the facts as I find them after trial, taking into account the credibility of the witnesses and the evidence presented by the parties. Defendant Bernard DiSabatino, who is a real estate developer, retained the engineering and surveying services of Plaintiff Davis, Bowen & Friedel ("DBF") relating to four real estate projects: the Chickberry Project, Jestice Farm Project, Northeast Project, and Elkton Project (collectively, the "Projects").[2] Each project was based on a contract that enumerated the services to be provided for that project and a proposed

---

[1] *Davis, Bowen & Friedel, Inc. v. DiSabatino*, C.A. No. 14C-05-021, at 8 (Del. Super. Apr. 19, 2016) (TRANSCRIPT) (hereinafter "Trial Tr.").
[2] *Id*. at 7.

or estimated fee associated with the particular service. Each contract also stated: "Payment terms are in accordance with our attached Schedule of Rates No. 43. Should payments not be received in accordance with the above payment terms, [DBF] reserves the right to stop work on this project and reassign staff until such time as all outstanding monies are paid and staff can be reassigned to your project." Attached to each contract was a "schedule of rates and general conditions," setting forth various staff members' hourly rates and other payment terms ("Schedule 43"). Schedule 43 required "Payment terms: Net 30 days of invoice date."

On May 2, 2014, DBF filed suit against DiSabatino based on each of these contracts. This Court held a bench trial on April 19, 2016. Two witnesses testified at trial: William Zachary Crouch and Anthony Carrozza. Crouch, a registered professional engineer, is DBF's vice president and owner.[3] Carrozza worked with DiSabatino as a consultant on the Projects, attended every meeting, and handled all email communications between DBF and DiSabatino.[4] Between 2011 and 2013, DiSabatino and Carrozza spoke to Crouch about all four Projects multiple times a week and met with him at least twice a month.[5] Carrozza testified that he kept

---

[3] Trial Tr. 11 (Crouch).
[4] Trial Tr. 71-72 (Carrozza).
[5] *Id*. at 96:

> A: We communicated with Mr. Crouch in 2011, 2012, 2013. At least two, three, four - -
> Q: About Chickberry?

informal bill payment records and maintained a ledger listing amounts paid and to whom. DiSabatino did not, however, maintain a record of invoices that were received or outstanding.[6]

## A. The Chickberry Project

The Chickberry Project, which involved developing approximately 381 acres of land in Sussex County, Delaware, was based on a proposal DBF created and revised in 2006, and which the parties signed on January 12, 2007.[7] The County preliminarily approved the project in January 2009, and extended that approval several times, but the project never was completed.[8] Crouch, who was the project engineer for Chickberry, testified that DBF received a letter from the County extending the project to January 14, 2012.[9] He testified credibly that he never was told to cease work on this project.[10]

DBF claims DiSabatino owes a total of $49,234.78 on the Chickberry Project.[11] Nearly all the invoices underlying DBF's damages claim for Chickberry

---

A: About all of them. Four projects. Three, four, five times a week. Met with him at least twice a month.

[6] *Id*. at 93-96.
[7] Trial Exs. 1 (A) at 1, 7, 11.
[8] Trial Tr. 16 (Crouch).
[9] *Id*. at 14, 17. There was some discrepancy during trial about when the extension expired – January or June. *See id*. at 17, 47, 109, 113-14, 117; Trial Tr. 85 (Carrozza). This discrepancy is not material to my decision.
[10] Trial Tr. 32 (Crouch).
[11] *Id*. at 17.

relate to work completed, invoiced, and past due before May 2, 2011.[12] Only one invoice, dated March 6, 2013, relates to work done after May 2, 2011.[13] Before March 2013, the last work DBF performed on the project was attending a meeting in March 2011 with Tidewater and Artesian relating to water and sewer agreements.[14] A year before that, in March 2010, DBF worked to obtain preliminary approval for the extensions until 2012.[15]

Crouch testified that he regularly sent DiSabatino invoices, and DiSabatino did not object to the amount or services invoiced.[16] The invoices were sent on or about the date on the invoice.[17] Carrozza acknowledged receiving the March 6, 2013 invoice,[18] which related to extending the previously completed wetlands delineation.[19] Because DBF does not perform wetlands consulting, it retained outside consultants, paid those consultants, and then billed DiSabatino to be reimbursed for the expenses.[20]

DiSabatino contends that, except for the March 2011 meeting, no work was authorized after the preliminary plan was approved on January 14, 2009.[21]

---

[12] DBF periodically sent past due invoices after May 2, 2011, but no new work was done.
[13] Trial Tr. 15 (Crouch). The other invoices were for interest accruing on the past due amounts.
[14] *Id.* at 44; Trial Tr. 84 (Carrozza); Trial Ex. 1 (C) at 23.
[15] Trial Tr. 45-46 (Crouch); Trial Tr. 84 (Carrozza).
[16] Trial Tr. 15, 17, 22 (Crouch).
[17] *Id.* at 17.
[18] Trial Tr. 81 (Carrozza).
[19] Trial Tr. 16 (Crouch). "The wetlands delineation is only good for five years." *Id.*
[20] *Id.*
[21] Def.'s Resp. Br. 2.

Carrozza testified that he instructed Crouch to stop working on Chickberry, but concedes that his instruction was not memorialized in any letter or email.[22] In addition to asserting the work was not authorized, DiSabatino questions whether any wetlands work actually was done at all in 2013.[23] Therefore, according to DiSabatino, the last time DBF did any work on Chickberry was in March 2011.[24]

## B. The Jestice Farm Project

The Jestice Farm Project was based on a July 27, 2006 proposal made by DBF, which DiSabatino signed on November 15, 2006.[25] This project involved the development of a 91-acre parcel of land in Sussex County.[26] The initial work, such as the preliminary site plan approval, was completed in 2008.[27] The project received preliminary approval in January 2009.[28] Then, on March 4, 2011, DBF invoiced DiSabatino for work done in January 2011.[29] This January 2011 work involved preliminary site layout services because the layout of the project changed.[30]

---

[22] Trial Tr. 96 (Carrozza).
[23] *Id*. at 82.
[24] *Id*. at 82-83.
[25] Trail Ex. 2 (A) at 39.
[26] Trial Tr. 18 (Crouch).
[27] *Id*. at 46.
[28] Trial Tr. 84 (Carrozza).
[29] Trial Ex. 2 (B) at 43.
[30] Trial Tr. 46 (Crouch).

Crouch testified that DBF, at DiSabatino's direction, submitted one-year extensions for Chickberry and Jestice Farm.[31] The project received extensions through January 2012, at which time Crouch believed that DiSabatino intended to pursue both projects.[32] Crouch testified he never was told otherwise.[33]

Although the Jestice Farm Project's approval expired in January 2012, DBF began at the end of 2012 preparing construction documents for the subdivision plan[34] because "they were going to submit another extension."[35] The project already was approved, so getting the County to re-approve the project was not "that big of a hurdle."[36] Another extension, however, never was obtained, nor was the project ever completed.[37] DBF's communication with DiSabatino ended in 2013, at which time DBF had prepared approximately 65% of the project's final construction documents.[38] DBF maintains DiSabatino owes a total of $69,749.22 on the Jestice Farm Project, $55,275.81 of which is for work done after May 2, 2011.[39]

On May 7, 2013, DBF sent DiSabatino an invoice for the partially completed construction documents, which DBF started six to eight months before

---

[31] *Id.* at 113.
[32] *Id.* at 113-14; *see supra* note 9 and accompanying text.
[33] *Id.* at 113.
[34] *Id.* at 47; 114-15.
[35] *Id.* at 48.
[36] *Id.*
[37] *Id.*
[38] *Id.* at 21, 115, 119.
[39] *Id.* at 22.

that date in connection with seeking the extension.[40] Although Carrozza testified that he saw this invoice for the first time when it was attached to court documents,[41] his testimony on that topic was not credible. I conclude that DBF's course of conduct was to send its invoices regularly and automatically. DiSabatino failed to maintain records that would support its remarkably convenient contention that it did not receive this particular, fairly substantial, invoice.

Carrozza also testified that this project preliminarily was approved in January 2009 and that, other than one meeting in March 2011, which was billed through Chickberry, he "doesn't believe" any work subsequently was authorized.[42] Carrozza testified that in the spring of 2011, the Chickberry and Jestice Farm Projects fell through for two reasons: (1) DiSabatino could not get a new sewer contract, and (2) DiSabatino became aware that the property for both projects was the subject of foreclosure proceedings.[43] He testified that this information, along with the fact that DiSabatino was not going through with the projects, was communicated to DBF and Crouch.[44] Carrozza testified that DBF and Crouch also were aware of these foreclosure actions because Crouch spoke to Mr. Jestice, the owner of the property, "as much as he spoke to us about these two projects."[45]

---

[40] Trial Ex. 2 (B) at 53; Trial Tr. 114 (Crouch).
[41] Trial Tr. 85 (Carrozza).
[42] *Id*. at 84.
[43] *Id*. at 78-79.
[44] *Id*. at 79-80.
[45] *Id*. at 80.

7

Crouch disputes that Mr. Jestice informed him that the property was in foreclosure.[46] Crouch testified he stopped communicating with Mr. Jestice sometime in 2012.[47] Aside from Carrozza's testimony, there is nothing in the record to support DiSabatino's claim that DBF or Crouch were instructed to suspend or cease work.

### C. The Northeast Project

The Northeast Project was based on a July 21, 2009 proposal that was signed on October 26, 2009.[48] This project involved 43 acres of land located in Cecil County, Maryland. DiSabatino retained DBF to provide conceptual planning for a 250-unit development. After DBF created some conceptual layouts, the deal between the developer and the property owner fell through.[49] DBF completed the work on this project on September 10, 2010 for a total of $9,151.53.[50] Crouch testified that he sent several emails, statements, and invoices to DiSabatino requesting payment, but Crouch only received responses such as "we're working with investors; we're trying to find . . . builders."[51] On June 15, 2011, Crouch testified that he sent DiSabatino an email requesting that he pay $10,000 a month

---

[46] Trial Tr. 120 (Crouch).
[47] *Id*. at 119.
[48] Trial Exs. 3 (A) at 59, 61.
[49] Trial Tr. 23 (Crouch).
[50] *Id*. at 24, 54; Trial Tr. 83 (Carrozza).
[51] Trial Tr. 24 (Crouch).

8

toward past-due invoices relating to the Northeast Project and another project, the Elkton Project.[52]

### D. The Elkton Project

The Elkton Project, which involved 47 acres of land neighboring Elkton, Maryland, was proposed on July 21, 2006, revised on August 20, 2009, and signed by DiSabatino on August 31, 2009.[53] DBF was hired to turn the area into a 336-unit development, which included conceptual site planning, property annexation to the town, forest delineation, coordination with utility service companies, an aerial topography survey, and a wetlands delineation.[54] Crouch testified he did not know why the Elkton Project was not completed.[55] On July 25, 2012, he received an email stating "we're still working on financing."[56] Then on June 4, 2013, he received an email stating "we met with Ryan Homes today. Everything's looking good."[57] Crouch testified that in 2015, "all of a sudden," he received a request for the computer-aided design drawings (the digital files) for this project.[58]

The total outstanding balance on this project is $52,454.33.[59] It is undisputed that DBF last worked on the Elkton Project in 2013.[60] Crouch testified

---

[52] *Id.* This email is not in the record.
[53] Trial Exs. 4 (A) at 78, 80; Trial Tr. 25 (Crouch).
[54] Trial Tr. 25-26 (Crouch); Trial Exs. 4 (A) at 78-81.
[55] Trial Tr. 28 (Crouch).
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.* at 29.

that of the outstanding invoices, 12 or 13 invoices are dated after May 2, 2011.[61] Those invoices total $25,989.61.

## ANALYSIS

The primary dispute in this case is the timeliness of DBF's claims. In Delaware, no action based on a promise "shall be brought after the expiration of 3 years from the accruing of the cause of such action."[62] A cause of action for breach of contract accrues when the contract is broken, not when actual damage results or is ascertained.[63] One exception to this general rule involves what interchangeably is referred to as a "continuous contract" or a "continuing breach."

In continuous contract and continuing breach cases, "the statute begins to run only when full damages can be ascertained and recovered,"[64] which may not be until the contract terminates.[65] If, on the other hand, "the Court finds the contract severable in nature, the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract."[66] To determine if a contract is severable, Delaware courts consider whether the breaches

---

[60] Trial Tr. 92 (Carrozza).
[61] Trial Tr. 27 (Crouch).
[62] 10 *Del. C.* § 8106.
[63] *Worrel v. Farmers Bank*, 430 A.2d 469, 472 (Del. 1981).
[64] *Guerrieri v. Cajun Cove Condo. Council*, 2007 WL 1520039, at *6 (Del. Super. Apr. 25, 2007) (citing *Oliver B. Cannon & Son, Inc. v. Fid. & Cas. Co. of N.Y.*, 484 F. Supp. 1375, 1390 (D. Del. 1980)).
[65] *AM Gen. Hldgs. LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016) (citing *Smith v. Mattia*, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010)).
[66] *Kaplan v. Jackson*, 1994 WL 45429, at *2 (Del. Super. Jan. 20, 1994) (citing *Burger v. Level End Dairy Inv'rs,* 125 B. R. 894, 901-02 (Bankr. D. Del. 1991); *Worrel,* 430 A.2d at 474-75).

can be divided such that the plaintiff "could have alleged a *prima facie* case for breach of contract . . . after a single incident."[67] If such a case can be made, the contract is severable, "even when confronted with numerous repeated wrongs of similar, if not same, character over an extended period."[68] The continuing breach doctrine is "narrow" and "typically [] applied only in unusual circumstances."[69] The plaintiff bears the burden of proving that the continuing breach doctrine tolls the statute of limitations.[70]

DBF filed its claims for breach of contract on May 2, 2014.[71] DBF filed four separate cases, one for each contract, which later were consolidated. Therefore, to be timely, DBF's claims must have accrued on or after May 2, 2011.

DiSabatino maintains that DBF's claims are barred by the three-year statute of limitations because the contracts are severable rather than continuous. DiSabatino supports this position with the following facts: consideration for the services was not paid in one lump sum; consideration was paid in accordance with separate services; the scope of the work was broken down by individual tasks;

---

[67] *AM Gen. Hldgs. LLC*, 2016 WL 4440476, at *12 (citing *Price v. Wilm. Trust Co.*, 1995 WL 317017, at *2-3 (Del. Ch. May 19, 1995)).

[68] *Id.* (internal quotations omitted).

[69] *AM Gen. Hldgs. LLC*, 2016 WL 4440476, at *11 (citing *Desimone v. Barrows*, 924 A.2d 908, 924-25 (Del. Ch. 2007)).

[70] *Fike v. Ruger*, 754 A.2d 254, 261 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000) ("The plaintiffs bear the burden of proving that tolling is available.") (citing *U. S. Cellular Inv. Co. v.. Bell Atl. Mobile Syss., Inc.,* 677 A.2d 497, 504 (Del. 1996)).

[71] DiSabatino incorrectly contends DBF's claims were filed on September 23, 2014. The docket contradicts this contention.

services were performed in multiple phases; and either party could terminate the contract at any time.[72] Because each contract is severable, DiSabatino argues, each claim accrued at the time of each breach, that is, when each invoice was not paid within 30 days of its issuance.

DBF responds that each contract is continuous and therefore the claims only accrued at the termination of each contract, which DBF implicitly argues was the first time full damages could be ascertained.[73] DBF contends that the trial testimony contradicts DiSabatino's position that services were performed in multiples phases; Crouch testified that: "They're typically done at the same time. When you're doing a property line survey, you're also doing topography, you're also coordinating with []wetlands delinea[t]ion, but it's all done at the same – pretty much the same time."[74]

**A. Damages for the Chickberry Project are barred by the statute of limitations, except for the invoices that became overdue after May 2, 2011.**

DBF's breach of contract claim for the Chickberry Project is supported by a few invoices and the testimony of one witness. DBF is requesting $49,234.78 in damages relating to this project going back to services performed in 2008. The last time DBF undisputedly worked on this project is in March 2011.

---

[72] Def.'s Resp. Br. 2.
[73] Pl.'s Trial Memo. on Statute of Limitations 2.
[74] Pl.'s Reply ¶ 3 (citing Trial Tr. 31. (Crouch)).

Although DBF contends it worked on the project in 2013, DiSabatino claims the last service performed was in March 2011. Carrozza testified Crouch was told the project was dead and he should stop working. DiSabatino argues: additional work neither was done nor authorized in January 2013; the work described in the March 6, 2013 invoice previously was performed and billed; and the March 6, 2013 invoice does not describe any services DBF performed. Alternatively, DiSabatino argues that if the last day of service was in March 2013, DBF is entitled to $2,479.14 because the contract is divisible and the statute of limitations precludes recovery for services rendered more than three years before the complaint was filed.

DBF argues it defies common sense to continue working on a project after being told it is not going forward, and Crouch testified that DBF was not told to stop working.[75] In addition, DiSabatino offered no evidence confirming Carrozza's testimony that DBF was told to stop working on this project.[76]

The parties' arguments largely focused on whether the contracts were continuous or severable. In my view, the resolution of DiSabatino's statute of limitations defense turns on a distinct question: when DBF's damages could be determined and recovered.

---

[75] Trial Tr. 117-19 (Crouch).
[76] Trial Tr. 98 (Carrozza).

That question is determinative because, even where there is a continuous contract or continuing breach, "the statute begins to run the moment full damages can be determined and recovered."[77] That is, even if the Chickberry contract was a continuous contract,[78] DBF's claim accrued when DBF was able to determine and recover its damages. Although DBF assumes that was when the contracts were terminated, that conclusion is not supported by the record. Rather, after the 30-day contractual payment period had passed,[79] and DiSabatino had failed to pay, DBF could ascertain its damages and pursue its claim. Although DBF vigorously argues the contracts were continuous, it does not explain why its damages could not be ascertained when the invoices went unpaid.[80] Accordingly, claims for invoices overdue before May 2, 2011 are barred by the statute of limitations. Those that became overdue after May 2, 2011, or that relate to services rendered after that date, are not time-barred.

DiSabatino also argues DBF's work after May 2, 2011 neither was authorized nor performed. This argument is inconsistent with, and unsupported by, the testimony and exhibits admitted at trial. DiSabatino received invoices and

---

[77] *AM Gen. Hldgs. LLC*, 2016 WL 4440476, at *11.

[78] The weight of the evidence supports a conclusion that the contracts were severable, rather than continuous. The separate identification of distinct services to be provided, the issuance of periodic bills related to those services, and the extended and undelineated term of the contract all support a conclusion of severability. The Court, however, need not reach that issue because the damages could be ascertained at the time the invoices were overdue, even if the contract was continuous.

[79] *See* Schedule No. 43.

[80] *See AM Gen. Hldgs. LLC*, 2016 WL 4440476, at *11 (citing *Price*, 1995 WL 317017, at *2-3).

never objected on any basis to the work or amounts, including on the basis that the work was not authorized or previously was performed. Based on DiSabatino's witness's testimony, the parties met and spoke often about all four Projects through 2013. DiSabatino's purported instruction to DBF to stop work on this project (or any other) was not memorialized in writing, and DiSabatino's witness was not credible on this point. Moreover, DBF's conduct evidences its belief that the contract was not terminated. For example, DBF continued working and incurring expenses, including substantial out-of-pocket expenses for a wetlands consultant. Accordingly, DiSabatino cannot avoid DBF's timely claims under the pretense that the work was not authorized or performed.

### B. Damages for the Jestice Farm Project are barred by the statute of limitations, except for the invoice that became overdue after May 2, 2011.

DBF is entitled to $55,275.81 for the Jestice Farm Project. DBF seeks damages for work done in 2008, 2011, and 2013 on this project. DBF contends that it worked through May 7, 2013, when it billed DiSabatino for the work it had completed until that point.[81] The May 7, 2013 invoice relates to services rendered approximately six months before the work was invoiced.[82] DiSabatino contends this work neither was performed nor authorized.[83] DBF's earlier work on this

---

[81] Pl.'s Post Tr. Memo. 5.
[82] Trial Tr. 49, 114 (Crouch).
[83] Def.'s Resp. Br. 3.

project was done in January 2011, more than two years before the May 7, 2013 invoice. For the same reasons as explained above, DBF was able to determine and recover its damages at the time the invoices were not paid, and, therefore, only those claims for invoices overdue after May 2, 2011 survive. DiSabatino's contentions that this work was not authorized and that he did not receive the invoice fails because DiSabatino presented no credible evidence to support those contentions.

### C. DBF cannot recover damages for the Northeast Project.

DiSabatino contends the latest date of service relating to the Northeast Project is December 23, 2009 for work performed in November 2009. In post-trial briefing, DBF conceded that its claims relating to the Northeast Project were barred.[84] I agree. The trial testimony was consistent that this project was completed by September 10, 2010. Accordingly, even using the latest date in the record, the statute of limitations bars any claim relating to this project. This is so whether the contract is continuous or severable, since damages were ascertainable and recoverable by September 2010.

---

[84] Pl.'s Reply ¶ 5.

**D. Damages for the Elkton Project are barred by the statute of limitations, except for the invoices that became overdue after May 2, 2011.**

As to the Elkton Project, DiSabatino argues that DBF's recovery should be limited for two reasons: (1) the contract is divisible so DBF's recovery is limited to services performed after May 2, 2011; and (2) DBF "should have insisted that the environmental work (wetlands and forest delineation) [be] completed prior to preparing plans."[85]  DiSabatino therefore maintains that DBF is entitled to no more than $19,002.50.[86]  DBF responds that "the work on the Elkton Project was documented by [DBF's] invoices and Mr. Crouch's testimony."[87]

DBF is entitled to $25,989.61 for 12 invoices.  Again, DBF was able to ascertain its damages on this project when DiSabatino failed to pay the invoices within 30 days of the invoice date.  Twelve invoices became due after May 2, 2011.  Accordingly, recovery is not barred by the statute of limitations as to these invoices.  As to DiSabatino's argument that DBF should have completed certain work before beginning other services, there is nothing to indicate DBF acted unreasonably or in a manner inconsistent with the contract.

---

[85] Def.'s Resp. Br. 4 (emphasis in original).
[86] DiSabatino's amount is based on duplicative invoices and the faulty premise that the complaint was filed in September 2014.
[87] Pl.'s Reply ¶ 6 (citing Trial Tr. 25-29 (Crouch)).

**E. DBF is entitled to attorneys' fees and costs.**

DBF contends each of the four contracts entitle it to recover attorneys' fees and costs in pressing its claims. Schedule 43, attached and referenced in each contract, provides: "If required to engage legal counsel to collect an overdue invoice, DBF shall be entitled to recover also its costs of collection, including counsel fees and expenses."[88]

Generally, Delaware courts follow the American Rule, whereby each party bears its own costs and attorneys' fees.[89] There are, however, long recognized exceptions, one of which is a contractual fee-shifting clause.[90] Here, the parties entered into four contracts whereby "DBF shall be entitled to recover [] its costs of collection, including counsel fees and expenses."[91]

As previously explained, DBF succeeded, at least partially, in its claims under the Chickberry Project, Jestice Farms Project, and Elkton Project. DBF did not succeed on its claim under the Northeast Project. Therefore, DBF only is entitled to recover those reasonable attorneys' fees and costs associated with the portion of its claims pertaining to Chickberry, Jestice Farms, and Elkton. DBF

---

[88] Trial Ex. 1 (A) at 8; Trial Ex. 2 (A) at 40; Trial Ex. 3 (A) at 62; Trial Ex. 4 (A) at 81.

[89] *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006).

[90] *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014); *Bergin v. McCloskey,* 2008 WL 4662378, at *1 (Del. Com. Pl. Oct. 22, 2008).

[91] Trial Ex. 1 (A) at 8; Trial Ex. 2 (A) at 40; Trial Ex. 3 (A) at 62; Trial Ex. 4 (A) at 81.

may file a petition and affidavit associated with the fees and expenses it believes it is entitled to receive.

## **CONCLUSION**

For the reasons stated above, DBF is entitled to $2,479.14 for the Chickberry Project, $55,275.81 for the Jestice Farm Project, and $25,989.61 for the Elkton Project, plus pre-judgment interest at 12%[92] beginning December 20, 2013, post-judgment interest at the legal rate,[93] attorneys' fees, and costs. DBF **SHALL** submit within **30 days** of the date of this decision an application detailing the basis for and amount of the reasonable attorneys' fees and costs expended litigating this case, but only as to those claims that were successful. DBF also simultaneously **SHALL** file a proposed form of final order. To the extent he objects to the amount of attorneys' fees or costs requested, or to the proposed form of order, DiSabatino **SHALL** file an opposition within **ten days** of the filing of DBF's application and proposed order. **IT IS SO ORDERED.**

---

[92] The contracts provided a contractual interest rate of 12% annually. Trial Ex. 1 (A) at 8; Trial Ex. 2 (A) at 40; Trial Ex. 4 (A) at 81.
[93] DBF demanded pre-judgment interest at the legal rate. Compl. 1.