**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| AM GENERAL HOLDINGS LLC, directly and derivatively on behalf of Ilshar CAPITAL LLC,<br><br>Plaintiff<br><br>v.<br><br>THE RENCO GROUP, INC., IRA L. RENNERT, and ILR CAPITAL LLC,<br><br>Defendants,<br><br>and<br><br>ILSHAR CAPITAL LLC,<br><br>Nominal Defendant. | C.A. No. 7639-VCS |
| THE RENCO GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MacANDREWS AMG HOLDINGS LLC, MacANDREWS & FORBES HOLDINGS INC., and RONALD O. PERELMAN,<br><br>Defendants,<br><br>and<br><br>AM GENERAL HOLDINGS LLC,<br><br>Nominal Defendant. | C.A. No. 7668-VCS |

**MEMORANDUM OPINION**


Date Submitted: May 23, 2016
Date Decided: August 22, 2016

Stephen P. Lamb, Esquire and Meghan M. Dougherty, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Wilmington, Delaware, and Robert A. Atkins, Esquire and Steven C. Herzog, Esquire of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, Attorneys for AM General Holdings LLC, MacAndrews AMG Holdings LLC, MacAndrews & Forges Holdings, Inc., and Ronald O. Perelman

Kevin G. Abrams, Esquire, J. Peter Shindel, Jr., Esquire, and Matthew L. Miller, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, and Jonathan M. Hoff, Esquire, William J. Natbony, Esquire, and Kyle G. Grimm, Esquire of Cadwalader, Wickersham & Taft LLP, New York, New York, Attorneys for The Renco Group, Inc.

Thad J. Bracegirdle, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware, Attorney for Ilshar Capital LLC

Joel Friedlander, Esquire and Christopher P. Quinn, Esquire of Friedlander & Gorris, P.A., Wilmington, Delaware, Attorneys for AM General Holdings LLC

SLIGHTS, Vice Chancellor

# I.    INTRODUCTION

Two business ventures pairing the plaintiff, The Renco Group, Inc. ("Renco"), with defendant, MacAndrews AMG Holdings LLC ("MacAndrews AMG"), have brought much success to their investors. Unfortunately, the attempt at collaboration has also generated seemingly endless litigation between the members as they battle over the distribution of profits from both joint ventures. This action, involving one of those ventures, AM General Holdings LLC ("Holdco"), was initiated more than four years ago, in June 2012. Since then the parties have litigated parallel actions with remarkable intensity.[1] In this latest motion, styled as a motion for partial summary judgment, MacAndrews AMG seeks an order declaring that the statute of limitations bars Renco from recovering damages on its claims that MacAndrews AMG breached Holdco's operating agreement to the extent the damages were sustained more than three years before Renco filed its complaint.[2] MacAndrews AMG acknowledges that the statute of

---

[1] *See, e.g., AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2015 WL 3465956 (Del. Ch. May 29, 2015); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2015 WL 1726418 (Del Ch. Apr. 9, 2015); *The Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011 (Del. Ch. Jan. 29, 2015); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2014 WL 6734250 (Del. Ch. Nov. 28, 2014); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2013 WL 5863010 (Del. Ch. Oct. 31, 2013); *The Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2013 WL 3369318 (Del. Ch. June 25, 2013); *AM Gen. Hldgs. LLC v. The Renco Gp. Inc.*, 2013 WL 1668627 (Del. Ch. Apr. 18, 2013); *AM Gen. Hldgs. LLC v. The Renco Gp., Inc.*, 2012 WL 6681994 (Del. Ch. Dec. 21, 2012).

[2] *See* Limited Liability Company Agreement of AM General Holdings LLC ("Holdco Agreement"), attached as Ex. A to the Transmittal Aff. of Meghan M. Dougherty in

1

limitations, on any reading of the record, does not bar the entirety of Renco's three separate breach of contract claims. Nevertheless, it maintains that the motion, if granted, will "substantially reduce the scope and stakes of this litigation."[3]

Renco opposes the motion on three alternative grounds: either the statute of limitations has not begun to run because the breaches relate to mutual, running accounts that have not yet closed;[4] or the claims of breach have not yet accrued because the breaches are continuous; or the statute of limitations was tolled because Renco was unable to discover the breaches until substantially after they occurred.

After carefully reviewing the record and the parties' submissions, I am satisfied that the parties' complex business association in Holdco did not involve a mutual, running account. Renco has alleged clearly divisible and separately actionable breaches of the Holdco Agreement which do not arise from a single, perpetual account. Nor does the record support Renco's contention that

---

Supp. of MacAndrews AMG Holdings LLC's Mem. of Law in Supp. of its Mot. for Partial Summ. J. ("Dougherty Aff. 1"). In an earlier decision, this Court dismissed claims against all defendants except MacAndrews AMG. *See Renco*, 2015 WL 394011, at *4, *11.

[3] MacAndrews AMG Holdings LLC's Mem. of Law In Supp. of Its Mot. for Partial Summ. J. 2.

[4] *See* 10 *Del. C.* § 8108 ("In the case of a mutual and running account between parties, the limitation specified in § 8106 [three years] of this title shall not begin to run while such account continues open and current.").

2

MacAndrews AMG has engaged in a single, continuous breach of contract such that its claims for breach will not accrue until the Holdco Agreement is terminated. If they have occurred, the breaches have been separate and any related causes of action accrued at the time of breach. Finally, the undisputed record offers no bases for Renco to advance a "time of discovery" or "equitable tolling" rejoinder to MacAndrews AMG's well-supported statute of limitations defense. Renco knew or should have known of the alleged breaches at the time they occurred.

Each of the separate breach claims at issue in this motion is subject to a three year statute of limitations that began to run at the time of breach. Accordingly, MacAndrews AMG's motion for partial summary judgment must be granted.

## II.    FACTUAL BACKGROUND

### A. The Parties and Their Joint Venture

Prior to August 2004, Renco was the sole member of AM General LLC ("AM General"), a Delaware limited liability company that manufactured and sold specialized vehicles including, among others, a military vehicle known as the "Humvee."[5] In August 2004, Renco and MacAndrews & Forbes Holdings Inc. ("MacAndrews & Forbes") negotiated a rather complex joint-venture transaction. Pursuant to the Holdco Agreement, which memorialized the transaction, the parties created Holdco as the entity through which the joint venture would be executed.

---

[5] Verified Second Am. Compl. ("SAC") ¶ 3.

Renco contributed AM General to Holdco along with its wholly owned subsidiary, General Engine Products LLC ("GEP").[6]  For its part, MacAndrews & Forbes, through its wholly-owned subsidiary, MacAndrews AMG, contributed cash.[7]

As part of the joint-venture transaction, Holdco and ILR Capital LLC ("ILR Capital"), a Renco affiliate, also formed and became members of Ilshar Capital LLC ("Ilshar"), a company that made investments for the benefits of its members.  MacAndrews AMG was designated as the managing member of Holdco; ILR Capital was designated as managing member of Ilshar.[8]  The joint-venture structure thus contemplated that MacAndrews AMG and Renco each would maintain minority interests in the entity managed by the other party.[9]

## B. The Holdco Agreement

Under the Holdco Agreement, Renco and MacAndrews AMG each maintain capital accounts in Holdco to reflect their interests in the enterprise.[10]  Renco's

---

[6] *Id.* ¶¶ 4, 65. GEP builds and sells engines—principally a 6.5-liter diesel engine (the "6.5L Diesel Engine")—to customers that include AM General.  AM General uses GEP's engines in at least two ways: for installation in new Humvees and for sale as replacement parts in existing Humvees.  The latter practice occurs through AM General's service, parts and logistics division ("SPLO"). *Id.*

[7] MacAndrews AMG's $110 million contribution amounted to 22.13% of the total contributions made to Holdco.  Holdco Agreement sched. A.

[8] *Id.* ¶¶ 28, 31; Holdco Agreement §§ 1.1, 6.1.

[9] *See* Compl. ¶¶ 30–31; Holdco Agreement §§ 6.1–.4.

[10] Holdco Agreement § 4.3.

capital account began at roughly $387 million, which reflected the value of its initial capital contribution.[11]  MacAndrews AMG's capital account began at $110 million.[12]  The balance in each capital account fluctuates based on a contractually-defined allocation and distribution scheme. Renco is entitled to a preferred allocation of $15 million annually if AM General hits certain performance benchmarks, 100% of the profits (and 100% of the losses) from activities related to GEP's sale of its 6.5L Diesel Engines (the "GEP Business") and 30% of the profits (and 30% of the losses) generated by AM General after deductions of the $15 million preferred allocation and distributions from the GEP Business.[13]  MacAndrews AMG retains the remaining 70% of AM General's profits and losses.[14]

The parties' capital accounts diminish each time Holdco makes a distribution, which occurs periodically.[15]  According to Renco, MacAndrews AMG received $1.7 billion in distributions from Holdco between August 2004 and December 31, 2011.[16]  The capital accounts are to remain open until Holdco is

---

[11] SAC ¶ 33; Holdco Agreement sched. A.

[12] *See* sources cited *supra* note 11.

[13] Holdco Agreement § 8.1.

[14] *Id.*

[15] *Id.* §§ 4.3, 9.1.

[16] SAC ¶ 36.

liquidated, at which point each Holdco member will receive the balance in its account.[17]

To account for the fact that MacAndrews AMG maintains sole and exclusive management authority over AM General and GEP,[18] Renco sought and obtained a number of contractual protections to ensure its investment was managed fairly.[19] Several provisions in the Holdco Agreement arguably serve that purpose:

> **Section 6.2(d)** – requires that "all transactions" between "AM General or any of its Subsidiaries, on one hand, and a Member or any Affiliates thereof, on the other hand, shall be no less favorable . . . than would be the case in an arms'-length transaction."
>
> **Section 6.4(c)** – requires Renco's approval for certain actions, including "any sale, transfer, distribution or other disposition of any of the assets or Capital stock of GEP, other than . . . in the Ordinary Course of Business."
>
> **Section 6.4(s)** – requires mutual consent for "the payment of a management fee or similar fee . . . by[ ] [Holdco], AM General or any of its Subsidiaries," to "an affiliate" of MacAndrews AMG or MacAndrews & Forbes . . . .
>
> **Section 8.1(a)** – provides Renco with a preferred allocation of "[a]ll GEP Profits and Losses . . . ."

---

[17] *Id.* ¶¶ 34–35.

[18] Holdco Agreement § 6.2(d) ("[T]he Managing Member shall have the power and authority to . . . direct the management of the AM General Business, including setting its policy and overall direction, [and] managing the day-to-day business operations and affairs of AM General and its Subsidiaries, supervising their officers and directors, appointing and terminating their officers and employees and delegating duties to such Persons . . . ."); *id.* § 1.1 (defining "Managing Member" as MacAndrews AMG).

[19] SAC ¶ 37.

**Section 8.3(b)** – allows Renco to cause MacAndrews AMG to distribute cash to Renco if MacAndrews AMG's Revalued Capital Account falls (or will fall) below the level specified in § 9.4(c).

**Section 9.4(c)** – bars distributions to MacAndrews AMG if MacAndrews AMG's Revalued Capital Account would, as a result, become "equal to or less than 20% of the aggregated Revalued Capital Account of all Members."

**Section 10.1** – requires MacAndrews AMG to maintain "books of account" for Holdco which are "open to inspection and examination at reasonable times by each Member" and to supply detailed financial information annually and performance reports monthly to each Member.

**Section 12.3(a)** – preserves "the duties and liabilities of a Covered Person otherwise existing at law or in equity" unless the Holdco Agreement restricts those duties and liabilities.[20]

## C. Renco Uncovers Practices Relating to GEP That It Alleges Breach the Holdco Agreement

Renco alleges that MacAndrews AMG has engaged in an ongoing scheme "to unfairly enrich [the Defendants] at the expense of minority stake-holders" by leveraging its position as managing member of Holdco to drive down profits from the GEP Business in a manner that has resulted in diminished distributions to the

---

[20] *See Renco*, 2015 WL 394011, at *2 (discussing in detail the structure and relevant provisions of the Holdco Agreement) (internal footnotes omitted). The Holdco Agreement defines the "Revalued Capital Account" of each member as "the Capital Account balance such Member would have if all of the assets of the Company were sold for their respective gross fair market values . . . and the resulting Profits, Losses, and all other items of income, gain, loss and deduction were allocated to the Members pursuant to Sections 8.1, 8.2, 8.3 and 8.4." Holdco Agreement § 4.4.

7

Renco capital account.[21]  MacAndrews AMG has targeted three aspects of this alleged scheme that involve claims of breach of the Holdco agreement that it asserts are time barred by the statute of limitations—Renco's claims that MacAndrews AMG caused: (1) AM General to charge GEP unauthorized management fees and royalties; (2) AM General to charge engineering, research and development ("ER&D") costs unrelated to the 6.5L Diesel Engine to the GEP Business; and (3) GEP to charge AM General unjustifiably low prices for its engines (so-called "transfer pricing").[22]

### 1. The Unauthorized Management Fees and Royalties

Renco's distrust of MacAndrews AMG reared as early as July 19, 2005.  On that date, Renco's outside counsel, Michael C. Ryan, sent a letter to MacAndrews & Forbes accusing MacAndrews AMG of violating the Holdco Agreement by implementing inappropriate "royalty and management fee arrangements."[23] According to Mr. Ryan, those "arrangements" had been put in place "at some point after the creation of [the] joint venture" and were later memorialized in a Management Agreement between AM General and GEP, effective as of August 10,

---

[21] *Id.* ¶ 7.

[22] *Id.* ¶¶ 51–68.

[23] Dougherty Aff. 1 Ex. C (July 19, 2005 Letter) 1–3.

2004.[24] Mr. Ryan stated that Renco first received a copy of the Management Agreement on June 24, 2005.[25] The letter then cited Sections 6.4 and 8.1 of the Holdco Agreement in support of Renco's claim that MacAndrews AMG was in breach of contract[26]—the same two provisions Renco now cites in support of its breach claims in this action—and quantified the damages suffered to date.[27] Mr. Ryan included in his letter a request that MacAndrews AMG agree to submit aspects of the dispute to arbitration.[28]

By letter dated August 1, 2005, Barry F. Schwartz, general counsel for MacAndrews & Forbes, responded to Renco's charge that royalties and management fees paid to MacAndrews AMG were unauthorized and in breach of the Holdco Agreement. In doing so, Mr. Schwartz highlighted MacAndrews AMG's "broad authority" as managing member "to manage the day-to-day business and operations of AM General and its subsidiaries," and countered Renco's position that the decisions to authorize either the royalties or management

---

[24] *Id.* The Management Agreement obligated GEP to pay AM General royalties of 2.5% for the use of AM General intellectual property and a monthly management fee in excess of $100,000. Dougherty Aff. 1 Ex. B (Management Agreement) § 4(b)–(c).

[25] July 19, 2005 Letter 2.

[26] *Id.* 1–3.

[27] *Id.* 6; SAC ¶¶ 108–09, 114; *see also* Transmittal Aff. of William J. Natbony ("Natbony Aff.") Ex. H (Consulting Report) 6 (quantifying royalty payments and management fees for select periods).

[28] July 19, 2005 Letter 3.

9

fees were significant enough to require Renco's consent.[29]  Mr. Schwartz closed his letter by committing to discuss the issues further.[30]  The parties did not resolve the issue and the royalties and management fees continued to be billed to and paid by GEP.  They are now a component of Renco's breach claim.

## 2.  The Unauthorized ER&D Costs

Renco has consistently maintained that the Holdco Agreement allows only ER&D costs relating to the development of the 6.5L Diesel Engine to be charged to the GEP Business when calculating GEP Profits and Losses for purposes of making distributions to Holdco members.  Yet, according to Renco, MacAndrews AMG charged to the GEP Business more than $130 million of ER&D costs associated with engines other than the 6.5L Diesel without explanation or justification.[31]  AM General has charged these ER&D costs to the GEP Business since as early as November 2006, as Renco was aware.[32]

Renco kept tabs on its investment by attending AM General's monthly business review meetings.[33]  During 2006 and 2007 Renco learned that GEP sought to expand its business by meeting with potential partners and investigating

[29] Dougherty Aff. 1 Ex. F 2–5.

[30] *Id.*

[31] SAC ¶¶ 61–64.

[32] Dougherty Aff. 1 Ex. D; *see* sources cited *infra* note 34.

[33] Consulting Report 3.

new engine models—that is, engines other than the 6.5L Diesel Engine.[34]

Relatedly, in 2006 and 2009, Renco received information indicating that GEP had incurred development expenses associated with different engines.[35] MacAndrews AMG continued to charge these ER&D costs to the GEP Business and this practice is now a component of Renco's breach claim.[36]

### 3. The Unauthorized Transfer Pricing

GEP profits and losses are directly affected by the prices at which it sells engines to AM General. Higher prices mean more profit for GEP as seller and less for AM General as buyer. In its Second Amended Complaint, Renco alleged for the first time in the litigation that MacAndrews AMG caused GEP to manipulate the transfer prices of engines sold to AM General in a manner that improperly

---

[34] *See* Transmittal Aff. of Meghan M. Dougherty in Supp. of MacAndrews AMG Holdings LLC's Reply Br. in Supp. of its Mot. for Partial Summ. J. ("Dougherty Aff. 2") Ex. A (indicating that during a business review meeting on April 26, 2006, GEP reported that it "took a business group to Austria to review the Steyr engine" and met with "Cummins . . . and . . . learned of a developed, but not fielded V6 diesel . . . that we will follow up on"); Dougherty Aff. 2 Ex. B (indicating that during a business review meeting on June 21, 2006, GEP reported that it "[c]ontinued discussions with Steyr Motors" and "[p]articipated in field demonstration and limited technical discussions"); Dougherty Aff. 2 Ex. C (indicating that during a business review meeting on December 18, 2007, GEP reported that its current and future engine development programs included numerous models aside from the 6.5L Diesel Engine).

[35] Dougherty Aff. 1 Ex. D (February 1, 2007 email indicating that GEP's "G&A" expenses—presumably referring to general and administrative expenses—included "development work on the ECV 1.5 engine"); Dougherty Aff. 2 Ex. E (July 16, 2009 email providing an account readout listing "IR&D" "Project Expenses" as including costs associated with "P250 and Steyr Projects" as well as "P200, P300 and P400 engines").

[36] SAC ¶¶ 61–64.

11

shifted profits from Renco's capital account to MacAndrew's AMG's capital account.[37] But Renco had directed that allegation against MacAndrews AMG as early as December 2005.[38]

In September 2005, Renco advised AM General that it had retained independent accountants at Crowe Chizek & Co. LLC ("Crowe Chizek") "to examine the books of account of AM General for the purpose of confirming the accuracy of information received from the Company."[39] During October and November 2005, Crowe Chizek completed diligence at Renco's direction, which entailed inquiring about "transfer pricing between GEP and [AM General]," AM General's "methodology for pricing engines," any "price list[s] for different engines," and a "contract between [AM General] and GEP fixing the prices."[40] Perhaps most pointedly, in a November 21, 2005 email, Crowe Chizek indicated it needed "a better understanding" of "sales between [AM General] and GEP," and asked an AM General employee:

> What is the rationale for sales to GM and [AM General] being 15% lower than other customers (I'm guessing that it is volume related). Is there a contract for GM and [AM General] prices that I can agree [sic] the sales prices to? Renco has also asked that I sample some of the

---

[37] *Id.* ¶¶ 66–69.

[38] *See* Dougherty Aff. 1 Ex. E.

[39] Natbony Aff. Ex. F.

[40] Natbony Aff. Ex. G.

other sales prices.  When would GEP be able to justify a price increase to AMG?  In one of your notes you mentioned that there was a price increase in 2003.[41]

In a response letter dated December 5, 2005, MacAndrews AMG took the position that "inquiries concerning the potential for intercompany price adjustments" were "beyond the scope of the review of [AM General's] books and records that Crowe has been authorized to pursue."[42]  It nonetheless explained that it had conducted an internal review and concluded that "a decrease in such prices is justified to reflect the recent price concessions that [AM General] and SPLO granted to the government for fiscal years 2005–2007."[43]

Crowe Chizek disagreed. In the report it ultimately submitted to Renco, dated December 2, 2005, Crowe Chizek indicated that GEP's "selling prices to [AM General] and GM are less than the prices to other customers due to the volume of engines purchased."[44]  Renco chose not to pursue its claim relating to transfer pricing until it filed its Second Amended Complaint in this litigation.

---

[41] Dougherty Aff. 1 Ex. G.

[42] Dougherty Aff. 1 Ex. E

[43] *Id.*

[44] Consulting Report 5.  The consulting report further indicates that Crowe Chizek had "analyzed the sales transactions between GEP and [AM General] for the months of November 2003, May 2004, November 2004 and May 2005." *Id.*

## D. Procedural History

Renco filed its initial complaint on June 29, 2012. That complaint contains allegations that MacAndrews AMG manipulated the capital accounts through the use of management fees, royalties, and improper ER&D cost apportionment. It does not mention transfer pricing. Transfer pricing allegations first appeared in the Second Amended Complaint, which was filed on February 7, 2014. That complaint sets forth nine causes of action on theories of breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, aiding and abetting breaches of contract and fiduciary duties, tortious interference with contract, fraudulent transfer, and related requests for declaratory judgment.

This Court's January 29, 2015 ruling on Defendants' motion to dismiss whittled extant claims down to three—all that remain are Renco's claims against MacAndrews AMG for breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and related requests for declaratory judgment (Count VIII).[45] The surviving claims include allegations that MacAndrews AMG caused Holdco to make inappropriate loans to MacAndrews AMG affiliates, that MacAndrews AMG refused to disclose certain information in contravention of Section 10.1 of the Holdco Agreement and that MacAndrews

---

[45] *Renco*, 2015 WL 394011, at *11. Counts numbered III, IV, V, VI, VII, and IX were dismissed, which explains why the remaining Counts lack numerical continuity.

AMG took distributions at inappropriate times given the state of the members' capital accounts.[46] The Motion does not address these allegations; the only claims MacAndrews AMG has challenged on statute of limitations grounds are breach of contract claims relating to management fees, royalties, ER&D costs, and transfer pricing.

The parties do not dispute that much, if not most, of the conduct giving rise to Renco's claims relating to management fees, royalties, ER&D costs, and transfer pricing occurred long before the three years preceding the filing of Renco's complaint on June 29, 2012. Indeed, the conduct that has prompted Renco to allege that MacAndrews AMG breached the Holdco Agreement by charging excessive management fees and royalties began as early as twelve years ago;[47] the claim alleging improper ER&D charges to the GEP Business relates to conduct that began as early as ten years ago.[48] When Renco filed its Second

---

[46] SAC ¶¶ 72–94, 117–19.

[47] The Management Agreement obligating GEP to pay AM General management fees and royalties is dated August 10, 2004, and provides that payments would commence October 31, 2004. Management Agreement § 4.

[48] See Dougherty Aff. 1 Ex. D (indicating that GEP incurred "Engineering" costs unrelated to the 6.5L Diesel Engine during November 2006).

Amended Complaint on February 7, 2014, the facts relating to its transfer pricing claim were nearly ten years old.[49]

Knowing full well that the statute of limitations is implicated here, Renco has packaged its multiple breach claims into a single box that it labels MacAndrews AMG's "manipulat[ion] [of] the calculation of the Capital Accounts of Holdco."[50] In doing so, Renco would have the Court characterize its capital account as a "mutual running account." This characterization, in turn, allows Renco to argue that any breach of the Holdco Agreement that affects the Renco capital accounts does not accrue for statute of limitations purposes until the accounts are no longer "open and current."[51] Alternatively, Renco contends that its breach claims have not yet accrued because MacAndrews AMG is engaged in a single, ongoing breach of the Holdco Agreement by continuously diverting profits from Renco's capital account into its own capital account. As for its breach claims

---

[49]According to MacAndrews AMG, the three-year statute of limitations (1) limits recovery for any improperly charged management fees, royalties, and ER&D costs to those charged after June 29, 2009 (three years before Renco asserted those claims in the initial complaint); and (2) limits recovery for all transfer pricing-related damages to those incurred after February 7, 2011 (three years before Renco asserted that claim in the Second Amended Complaint).

[50] The Renco Gp., Inc.'s Mem. of Law in Opp'n to MacAndrews AMG Holdings LLC's Mot. for Partial Summ. J. ("Answering Mem.") 1.

[51] 10 *Del. C.* § 8108 (adjusting the three-year statute of limitations for "mutual running accounts"). The parties agree that both the members' capital accounts remain "open and current."

relating to the ER&D costs and transfer pricing, even if they accrued more than three years prior to the filing of its complaint, Renco maintains that these two claims are subject to tolling under either the time of discovery doctrine or as a matter of equity. Finally, Holdco argues that its amended claims regarding transfer pricing should relate back to the filing of its original complaint.

The parties' dispute implicates the two most common points of contention in the realm of statute of limitations jurisprudence: (1) when does the cause of action accrue; and (2) should the statute of limitations be tolled? While the analysis can be fact intensive, often the record on summary judgment leaves no doubt as to the resolution of either point. This is such a case.

## III. ANALYSIS

### A. The Standard of Review

"The function of summary judgment is the avoidance of a useless trial where there is no genuine issue as to any material fact."[52] Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[53] "A fact is material if it might affect the outcome of the suit

---

[52] *Emmert v. Prade*, 711 A.2d 1217, 1219 (Del. Ch. 1997).

[53] Ct. Ch. R. 56(c).

under the governing law."[54]  A material issue of fact exists if "a rational trier of fact could find any material fact that would favor the non-moving party in a determinative way."[55]

The movant bears the initial burden of demonstrating that there is no question of material fact.[56]  When the movant carries that burden, the burden shifts to the nonmoving party "to present some specific, admissible evidence that there is a genuine issue of fact for trial."[57]  The court must view the evidence most favorably to the non-moving party.[58]  Even so, the non-moving party may not rely on allegations or denials in the pleadings to create a material factual dispute.[59]

## B. The Statute of Limitations

The statute of limitations at 10 *Del. C.* § 8106 requires a plaintiff to bring a breach of contract claim within three years of the accrual of the cause of action. The cause of action for a breach of contract accrues at "the moment of the

---

[54] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *3 (Del. Ch. Dec. 29, 2009).

[55] *Id.*

[56] *Id.*

[57] *Id.*

[58] Ct. Ch. R. 56(e); *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999), *aff'd*, 752 A.2d 112 (Del. 2000).

[59] *Fike*, 754 A.2d at 260.

wrongful act, even if the plaintiff is ignorant of the wrong."[60]  Although statutes of limitations are not controlling in equity, "equity follows the law and, in appropriate circumstances, applies the statute of limitations by analogy, denying relief when claims are brought after the analogous statutory period."[61]

C. **Mutual, Running Account**

As noted, the Holdco Agreement called for the members of Holdco to maintain two separate capital accounts into which distributable profits from Holdco would be deposited and from which chargeable losses or expenses of

---

[60] *Fike*, 754 A.2d at 260 (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998)).

[61] *Id.*; *accord Knutkowski v. Cross*, 2014 WL 5106095, at *1 (Del. Ch. Oct. 13, 2014). The claims that MacAndrews AMG now argues are time-barred—claims for breach of contract seeking money damages—are legal claims seeking legal relief. *Kraft v. WisdomTree Invs., Inc.*, 2016 WL 4141112, at *4 (Del. Ch. Aug. 3, 2016) ("Legal claims seeking legal relief [include] a breach of contract claim requesting money damages . . . .").  Chancellor Bouchard recently observed in *Kraft* that "there is not currently a clear answer" in our case law "as to whether statutes of limitations are to be applied strictly to purely legal claims" brought in the Court of Chancery.  After thoughtfully considering the question, the Chancellor endorsed a strict application of the statute of limitations with respect to purely legal claims on the rationale that "a plaintiff pressing a purely legal claim in the Court of Chancery should not be able to avoid the statute of limitations by invoking the doctrine of laches when the limitations period would have conclusively barred the same claim had it been brought in a court of law." *Id.* at *6.  In its briefing on the motion, Renco has not attempted to evade application of the statute of limitations by arguing that this Court should apply the doctrine of laches and that one or more of the three elements of laches have not been met. *See id.* at *4 ("A finding of laches generally requires the presence of three factors: the claimant's knowledge of the claim, unreasonable delay in bringing the claim, and resulting prejudice to the defendant.")  Thus, the issue of whether I ought to apply Section 8106's limitations period strictly is not properly before the Court and I do not address it. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

Holdco would be deducted. Renco argues that this dual-capital account arrangement functions as a mutual running account that will "remain open and current" until Holdco is dissolved or liquidated.[62] Citing 10 *Del. C.* § 8108, which provides that "[i]n the case of a mutual, running account between the parties, the limitation, specified in § 8106 of this title, shall not begin to run while such account continues open and current," Renco maintains that the statute of limitations has not yet begun to run.

Section 8108 leaves the term "mutual, running account" undefined. As must occur when a statute leaves room for interpretation, courts, treatises and legal encyclopedias endeavor to fill the statutory gap. In Delaware, our courts have defined a mutual running account as "one account upon which the items of either side belong and on which they would reciprocally operate so that a balance between the two may be ascertained."[63] The treatises and legal encyclopedias offer similar definitions.[64]

---

[62] *See* Holdco Agreement § 9.2 (allocating distributions upon liquidation); *id.* § 13.3 (directing distributions to occur during wind-up).

[63] *Brown v. Consol. Fisheries Co.*, 165 F. Supp. 421, 423 (D. Del. 1955); *accord Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 435 (D. Del. 1999); *Weymouth v. Dep't of Corr.*, 1983 WL 17987, at *6 (Del. Ch. July 18, 1983).

[64] *See, e.g.*, 31 *Williston on Contracts* § 79.26 (4th ed. 2015) ("[I]t is generally held essential, in order to constitute such an account as shall fall within the principle in question, that there shall be mutual open, current dealings and claims subject to a future final balance."); 1 *Am. Jur. 2d Accounts & Accounting* § 22 (2016) ("The 'last item' within this rule must arise from the mutual act and consent of both parties, with the

No particular format is required for an account to be deemed "mutual and running"; instead, the court looks to whether the parties intended that their respective entries would contribute to one account subject to future settlement or resolution.[65] The two sides of that account "must be . . . linked or connected in some way by an express or implied agreement" under which entries on each side of the ledger "reciprocally offset so that the balance between the two may be determined."[66] The statute of limitations does not begin to run on a claim relating to a mutual, running account until the date the account is closed.[67]

---

understanding, express or implied, that it is to enter into and become a part of their mutual dealing or account and is the subject of future adjustment in ascertaining the general balance due on the account.").

[65] *Brown*, 165 F. Supp. at 423 ("The material question is the mutuality or agreement, express or implied, which which [sic] the items, respectively, were made and the mutual expectation of the parties of a future settlement or adjustment and the intent to treat the items as one account."); 31 *Williston on Contracts* § 76.29 (4th ed. 2015) ("It is essential…that the items of the account shall have been regarded as constituting one account by the parties.").

[66] *Matter of Burger*, 125 B.R. 894, 902 (Bankr. D. Del. 1991) (quoting *Brown*, 165 F. Supp. at 423); *see also John D. Perovich, When is Account "Mutual" for Purposes of Rule that Limitations Run from Last Item in Open, Current and Mutual Account*, 45 A.L.R. 3d 446 (1972) (noting that, among courts applying the mutual account rule, "there is almost universal agreement that an account is mutual only where there are items debited and credited on both sides, which items operate to extinguish the other pro tanto, so that the balance on either side is the debt between the parties."); 1 *Am. Jur. 2d Accounts & Accounting* § 6 ("All that is necessary to establish a mutual account is to show that an account was kept and that the parties regarded the items as constituting one account and as capable of being set off, one against the other, so that it is only the net balance which constitutes the claim." (footnotes omitted)).

[67] *E.g.*, *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2004 WL 405913, at *7 (Del. Ch. Mar. 2, 2004); *Brown*, 165 F. Supp. at 423.

To understand better how to apply Section 8108, it is useful to consider for a moment the purpose of the statutorily defined limitations period for claims involving mutual, running accounts.[68] In his treatise on Delaware practice, Judge Woolley explains that statutes of limitations "proceed on the principle, that it is to the interest of the public to . . . afford a security against the prosecution of claims, where from lapse of time, the circumstances showing the true nature or state of the transaction . . . may be incapable of explanation by reason of [delay]."[69] The mutual, running accounts rule derives from a particular application of the familiar principle that statutes of limitations do not begin to run until a cause of action accrues.[70] The concerns regarding stale claims that animate statutes of limitations do not arise when facts that beget the cause of action have not played out and the cause of action, therefore, has not yet accrued.

---

[68] Although Section 8108's earliest statutory ancestor was first codified in the Delaware Code of 1852, Delaware courts have had few occasions to interpret the statute. Accordingly, I have looked elsewhere for guidance.

[69] 1 Victor B. Woolley, *Practice in Civil Actions and Proceedings in the Law Courts of the State of Delaware* § 508 (photo. reprint 1985) (1906) (noting the importance of fixing an appropriate time at which the cause of action accrues in order to fix an appropriate time at which the cause of action will expire).

[70] *See Greer Limestone Co. v. Nestor*, 332 S.E.2d 589, 592–93 (W. Va. 1985) ("[The mutual running account] rule is predicated on the general principle that the statute of limitations begins to run when a cause of action accrues."); *cf. McArthur v. McCoy*, 112 N.W. 155, 156 (S.D. 1907) (applying a statute providing that "[i]n an action brought to recover a balance due upon a mutual, open, and current account, where there have been reciprocal demands between the parties, the cause of action shall be deemed to have accrued from the time of the last item proved in the account on either side").

In the case of a mutual, running account, the gravamen of the parties' dispute against one another is a single number—the balance of the mutual, running account they share—and thus the cause of action's accrual date resets each time that number changes.[71] Stepwise transactions that contribute to the aggregate ending balance are baked into the controversy regarding the final number for statute of limitations purposes. Accounts of this nature can arise either from express creation or impliedly by conduct evidencing the parties' mutual intent continuously to adjust reciprocal demands as part of an "unsettled course of dealing."[72]

---

[71] *See Sheldon Grain & Feed Co. v. Schuetz*, 482 P.2d 1033, 1035 (Kan. 1971) ("In such case the last item so credited to the party against whom the balance is due is not payment of any particular item against him, but is in a sense treated as part payment of every item rightfully charged against him in the entire account."); *Spencer v. Sowers*, 234 P. 972, 973 (Kan. 1925) (explaining that an account will be deemed a mutual, open, current account "where pursuant to the original, express, or implied intention there is but one single and indivisible liability arising from such series of related reciprocal debits and credits, which liability is to be fixed on the one part or the other as the balance shall indicate at the time of settlement or following the last pertinent entry of the account"); *Wesley v. Walter A. Brown*, 196 A.2d 921, 921 (D.C. 1964) ("It is settled law that where there is a mutual open account between two parties it is implied that they have mutually consented that the items occurring from time to time in favor of the respective parties shall operate as mutual set-offs, and that the shifting balance, when either or both shall call for it, shall be the debt, and for this reason the statute of limitations does not run during such a state of mutual dealings, but only from the date of the last item . . . ."); *Greer*, 332 S.E.2d at 593 ("With regard to an account, whether an open, book, or running account, the general rule is that the statute of limitations ordinarily begins to run on the date that each credit charge is made in the absence of some express agreement between the parties.").

[72] *McArthur*, 112 N.W. at 156; *see also id.* at 156–57 ("As the plain purpose of our Legislature was to except from the six-year statutory bar, made applicable to all contractual obligations express or implied, only mutual accounts containing reciprocal

Under these principles, the *ne plus ultra* mutual, running account for purposes of Section 8108 is an account maintained by two parties that, at any given point in time, shows a positive balance for one side and a negative balance for the other. In other words, the account would carry a theoretical single balance that would fluctuate as offsetting debits and credits were posted to the ledger. Every "entry" therefore necessarily would be reciprocal. *Williston* defines mutual, running accounts using this format as an example, and *American Jurisprudence* describes them similarly.[73]

demands between the parties, the important prerequisite is a condition of mutuality and reciprocity of dealing sufficient to reasonably justify the inference of an understanding between the parties that the items of one account are to be set off against the items of the other account, so far as they go . . . ."); *E.P. Hinkel & Co. v. Wash. Carpet Corp.*, 212 A.2d 328, 330 (D.C. 1965) (noting that "[i]tems were entered on both sides at periodic intervals which operated to extinguish each other pro tanto" and "the claims upon each side were set off against each other" as facts supporting the conclusion that there was a mutual account); *Wesley*, 196 A.2d at 921; *Green v. Caldcleugh*, 18 N.C. (1 Dev. & Bat.) 320, 323 (N.C. 1835) ("[I]t seems to us that the true principle to be extracted . . . applies only in those cases, where these items are clearly parts of one continuing, mutual account, which, by the assent of the parties, are to be charged therein, whenever the same shall be adjusted. This assent may be shown by direct evidence of an agreement to that effect. It may be inferred also, when each party keeps a running account of the debits and credits of the account . . . . In these cases, the new items are evidence affirming the continuance of an unsettled account at that time, and warranting the fair presumption of a promise to settle it, and to pay the balance, which may be ascertained on settlement.").

[73] 31 *Williston on Contracts* § 79:26 (4th ed. 1972); 1 *Am. Jur. 2d Accounts & Accounting* § 6 (2015) ("All that is necessary to establish a mutual account is to show that an account was kept and that the parties regarded the items as constituting one account and as capable of being set off, one against the other, so that it is only the net balance which constitutes the claim."); s*ee also In re Lebling's Estate*, 42 Pa. D. & C. 151, 153–54 (Pa. Orph. 1941) (describing mutual accounts as requiring reciprocal demands, "as, for example, when A & B dealing together, A sells B an article of furniture, or any other

The only case the parties have cited where a Delaware court enforced Section 8108 as a counter to a statute of limitations defense fits this example, albeit not perfectly.[74] *Burger* involved a contractual arrangement that obligated each co-venturer in a business to pay specific ongoing future debts: one co-venturer was indebted to his counterparty for revenues; the other was obligated to pay certain variable costs of the business (rent, etc.). The Bankruptcy Court deemed this arrangement to be a mutual, running account.[75] Although the arrangement involved two separate debt streams, it could at all times be reduced to a single account balance owed to one side or the other once all offsetting entries were applied because the debts were owed directly by and between business partners.

The parties' capital accounts, by contrast, are structured as two separate accounts that are neither reducible to a single balance nor representative of joint indebtedness. To the contrary, the drafters of the Holdco Agreement took pains to segregate the capital accounts to ensure that each separate balance could expand

---

commodity, and afterwards B sells A property of the same or a different description, this constitutes a reciprocal demand, because A and B have a demand or right of action against each other"); *Jones v. Massey*, 1 Del. Cas. 63, 64 (Del. Ct. Q. Sess. 1795) (providing that an acceptable jury charge for "mutual dealings" for "accounts [that] are not closed" could include an illustrative example as follows: "suppose I sell to one of you a horse and charge you with it, you sell me a cow and charge me with it, and then a parcel of sheep and charge me with them, and so on . . . .").

[74] *Burger*, 125 B.R. at 902.

[75] *Id.*

and contract without a corresponding effect on the other. For example, Section 4.3(b)(i)–(ii) of the Holdco Agreement provides that a member's capital account will increase by the amount of cash contributed by that member to Holdco; Section 4.3(c)(i)–(ii) provides that the member's capital account will decrease each time that member receives a distribution. Thus, a debit or credit to one account would not necessarily have an offsetting effect on the other.[76] The "intent to treat the items as one account" is nowhere reflected in the Holdco Agreement.[77]

Moreover, unlike a mutual, running account, the periodic distributions to members from their respective capital accounts are calculated based on the proportionate values in *each* account. For example, MacAndrews AMG is not entitled to receive distributions if its Revalued Capital Account dips below 20% of Holdco's aggregated Revalued Capital Accounts.[78] Unauthorized allocations to or distributions from the capital account of one member can therefore create immediate, actionable losses for the other member long before the accounts are settled—indeed, that *precise* outcome is alleged in this action. Classic mutual,

---

[76] There may, at times, be an offsetting effect in the event of a contribution or distribution to or from a capital account. An offset would occur, for example, if a contribution adjusted each party's ownership percentage in a way that activated Section 9.4(c)'s parity mechanism that prevents distributions to MacAndrews AMG if its Revalued Capital Account falls below 20% of the Revalued Capital Accounts of all members. But that offset is not automatic; it depends upon the occurrence of a particular set of triggers.

[77] *See Brown*, 165 F. Supp. at 423.

[78] Holdco Agreement § 9.4(c).

running account scenarios, by contrast, are constantly fluid and unsettled until the final balance reveals the full extent of what is at stake between the parties.

Although profit and loss allocations are split between accounts pursuant to contractually-defined interest percentages, the capital accounts cannot be understood, "as constituting one account . . . capable of being set off, one against the other, so that it is only the net balance which constitutes the claim."[79] It is not surprising that Renco has not cited to a single case where a Delaware court has applied the mutual, running account exception in a format that approximates the capital accounts created by the Holdco Agreement. Any such application would allow joint-venturers to hold back on otherwise accrued claims, for strategic reasons or otherwise, until some indeterminate time down the road when the joint venture either dissolves or is otherwise terminated. "[I]t makes little sense as a matter of policy to interpret [Section 8106] so broadly as to permit a party to sit on its contractual rights" in this manner.[80] Accordingly, I reject Renco's argument that the three-year statute is tolled under Section 8108.

---

[79] 1 *Am. Jur. 2d Accounts & Accounting* § 6.

[80] *TIFD III-X LLC v. Fruehauf Prod. Co., LLC*, 883 A.2d 854, 865 (Del. Ch. 2004) (addressing the application of the statute of limitations to a counterclaim for recoupment); *see also Fike*, 754 A.2d at 263 (rejecting argument that untimely claims relating to accounts in a partnership could be revived after the expiration of the statute of limitations by the partnership's dissolution). Renco cites a case, *Gearhart v. Etheridge*, 205 S.E.2d 456 (Ga. Ct. App. 1974), in which the Georgia Court of Appeals affirmed a lower court's holding that joint venturers in a corporation created a mutual account by making "advances individually and jointly in payment of indebtedness, interest payments, current

27

D. **Continuing Breach**

Renco next asserts that MacAndrews AMG's misconduct, since 2004, has amounted to a single "continuing breach" of the Holdco Agreement. If the Court adopts this characterization of Renco's breach claims, then even those claims that preceded the filing of the complaint by nearly ten years would not have accrued for statute of limitations purposes.

Statutes of limitations generally do not begin to run "until all of the elements of the claim have occurred."[81] In the context of breach of contract claims, the date of breach typically supplies the accrual date as the elements of the claim can be linked to the act constituting the breach.[82] If the continuing breach exception applies, however, the statute begins to run the moment "full damages can be determined and recovered,"[83] which may not happen until the contract terminates.[84]

---

operating expenses, notes and other debts in connection with a corporation which they sought to control." *Gearhart*, 205 S.E.2d at 458. *Gearhart* is distinguishable from this case, however, because there is no indication that the *Gearhart* parties kept separate accounts that would each rise and fall based on the number and nature of inputs contemplated in the Holdco Agreement's various apportionment provisions.

[81] *Price v. Wilm. Trust Co.*, 1995 WL 317017, at *2 (Del. Ch. May 19, 1995).

[82] *Smith v. Mattia*, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010).

[83] *Branin v. Stein Rose Inv. Counsel, LLC*, 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015) (quoting *Burger*, 125 B.R. at 901–02).

[84] *See Smith*, 2010 WL 412030, at *4.

The continuing breach doctrine is "narrow" and "typically is applied only in unusual situations."[85]

To determine whether a breach (or series of breaches) is "continuing," Delaware courts consider whether the breach(es) can be divided such that the "plaintiff could have alleged a *prima facie* case for breach of contract . . . after a single incident."[86]  If so, our courts have determined that the "continuing breach" doctrine does not apply even when confronted with "numerous repeated wrongs of similar, if not same, character over an extended period."[87]  Stated differently, the doctrine of continuing breach will not serve to extend the accrual date for a breach of contract claim "where the alleged wrongful acts are not so inexorably intertwined that there is but one continuing wrong."[88]

Renco cites *Branin v. Stein Roe Investment Counsel, LLC*[89] for the proposition that a "continuing breach" can occur even when the damages flowing from the breach can be calculated at various intervals during the course of conduct giving rise to the claim.  Renco's effort to meld the unique facts in *Branin* with its

---

[85] *Desimone v. Barrows*, 924 A.2d 908, 924–25 (Del. Ch. 2007) (citation omitted).

[86] *Price*, 1995 WL 317017, at *2–3.

[87] *Id.*

[88] *Id.* at *3 (quoting *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987)).

[89] 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015).

claim that MacAndrews AMG has engaged in a continuing breach of the Holdco Agreement falls short.

In *Branin*, the Court held that an employer was in continuous breach of its operating agreement by repeatedly declining (at least five times) to indemnify the plaintiff-employee during the course of his decade-long litigation against the employer.[90] The damages at issue were, in theory, calculable on a rolling basis since they amounted to the steadily rising cost of plaintiff's legal fees and costs. Even though the employee's damages arguably were calculable, the court stressed that they were uncertain because his right to indemnification depended on the court in the underlying lawsuit *not* finding that the employee acted in bad faith or outside the scope of his authority.[91] The court added that this contractual limitation, pervasive in indemnification arrangements, justified following the common approach in indemnification cases of finding that the cause of action for indemnification does not accrue until the underlying litigation concluded.[92] Here, because neither the nature of the breach claims nor the Holdco Agreement itself presented any inherent contingency that would render Renco's otherwise calculable damages uncertain, *Branin* is inapposite.

---

[90] *Id.* at *1–2, *7.

[91] *Id.* at *7.

[92] *Id.*

Renco next argues that MacAndrews AMG's alleged breaches were, in fact, "inexorably intertwined" since each was merely a component of MacAndrews AMG's broader scheme to pad its capital account at Renco's expense. Similarly, Renco argues that the "critical inquiry" in determining whether a contract's obligations are continuous or severable is "whether the obligations under the contract are all done for the 'same general purpose,'"[93] which Renco characterizes as "the management and operation of AM General and the protection of Renco's interests in light of the fact that Renco was a non-managing, minority member of Holdco."[94]

Even assuming (without deciding) that the "general purpose" inquiry applies beyond the context of mechanics' liens or construction contracts,[95] Renco overstates its import. The "general purpose" inquiry informs whether parties to a

---

[93] *Smith*, 2010 WL 412030, at *4 (quoting *Joseph Rizzo & Sons v. Christina Momentum, L.P.*, 1992 WL 51850, at *3 (Del. Super. Feb. 21, 1992)).

[94] Answering Mem. 36.

[95] *See Joseph Rizzo & Sons,* 1992 WL 51850, at *3 (citing 53 *American Jurisprudence 2d Mechanics' Liens* § 196, as well as Minnesota and Maryland case law, for two propositions: (1) that "where work done or material furnished during different time periods-whether pursuant to additional contracts, under an 'account', etc.,-is considered 'continuous', courts will recognize the work as an 'entire' or 'continuous contract'"; and (2) "[t]he key consideration in determining whether an entire or continuous contract is present is whether the work was done or materials furnished for the same 'general purpose.'"); *Smith*, 2010 WL 51850, at *4 & n.29 (citing *Joseph Rizzo & Sons* for the proposition that "[t]he critical inquiry" in determining whether a construction contract was continuous or severable was "whether the obligations under the contract are all done for the same general purpose").

contract intended the contract to be continuous or severable.[96]  In this instance, however, the provisions Renco alleges were breached are clearly separable.[97]

Renco's claims of breach are based on MacAndrews AMG's violations of specific, identifiable provisions of the Holdco Agreement that occurred each time MacAndrews AMG charged unauthorized management fees and royalties, misallocated ER&D costs and manipulated transfer pricing.[98]  Each time GEP was charged with allegedly unauthorized management fees, royalties and ER&D costs, and each time GEP received deflated transfer prices, constituted a separate breach that had a separate effect on Renco's capital account.  These alleged breaches resulted in itemized damages that were determinable the moment they occurred such that "[c]omplete and adequate relief, if justified, could be shaped immediately

---

[96] *Smith*, 2010 WL 412030, at *4 & n.31 (holding that "[w]hether the obligations under a contract are continuous or severable turns on the parties' intent" and thereafter focusing on what both parties to a construction contract contemplated the deadline for performance to be); *cf. Joseph Rizzo & Sons*, 1992 WL 51850, at *3 ("The key consideration in determining whether an entire or continuous contract is present is whether the work was done or materials furnished for the same 'general purpose.'").

[97] Further, it cannot be the case that a party can unlock the possibility of tolling under the continuing breach doctrine simply by characterizing contractual obligations as collectively contributing to some broader end. Were that convention countenanced, the continuing breach doctrine might expand far beyond its logical scope since virtually every contract has a "general purpose" broader than the various intermediate objectives its individual terms accomplish.

[98] It is alleged that these actions violated sections 6.4(c), 6.4(s), and 8.1 of the Holdco Agreement. SAC ¶¶ 111–16.

or at any point" after Renco initiated the litigation.[99]  Indeed, Renco has quantified these damages in its pleadings.[100]  While the alleged breaches were repetitive, they were not "continuing" in the legal sense.

Renco has two remaining tolling theories, but does not argue that either preserves any aspect of its royalty and management fee claims.  Accordingly, I note at this juncture that MacAndrews AMG's motion for partial summary judgment is granted with respect to those claims.  Renco first brought the royalty and management fee claims in its original complaint, which was filed June 29, 2012.  Royalty and management fee claims that accrued more than three years before that date may not be prosecuted in this action.

### E.  The Time of Discovery Rule

Renco seeks to toll the statute of limitations with respect to its claims relating to ER&D costs and transfer pricing by invoking the so-called "time of discovery rule."  Application of the time of discovery rule delays the starter's gun for the statute of limitation in certain "narrowly carved out limited circumstances"

---

[99] *Kahn v. Seaboard Corp.*, 625 A.2d 269, 271 (Del. Ch. 1993).

[100] Renco alleges that MacAndrews AMG's wrongful imposition of management fees and royalties and misallocation of ER&D costs have resulted in the wrongful diversion of $84.8 million and $91 million, respectively, from Renco's capital account.  SAC ¶¶ 59, 63. Although no precise damages figure appears for Renco's transfer pricing claim, the Court can discern no reason why money damages resulting from those alleged breaches could not have been ascertained at the moment the allegedly discounted prices were charged.

when the facts at the heart of the claim are "so hidden that a reasonable plaintiff could not timely discover them."[101] These scenarios include instances: (1) where the defendant has fraudulently concealed key facts; (2) where the injury was "inherently unknowable" such that discovery of its existence "is a practical impossibility"; and (3) where a "plaintiff reasonably relies on the competence and good faith of a fiduciary" who is alleged to have engaged in wrongful self-dealing (also referred to as the "equitable tolling doctrine").[102] In any of these factual circumstances, the time of discovery rule operates to toll the statutory period until the claimant is on inquiry notice of its claim—that is, until facts surface that would lead a reasonably prudent person to discover the wrong.[103] Renco bears the burden of proving that tolling for the time it took to discover its claims is appropriate.[104]

To carry its burden, Renco contends it was unable to discover the predicate facts that support its ER&D and transfer pricing claims because it relied upon the good faith and competence of its alleged fiduciary, MacAndrews AMG, and did

---

[101] *Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006).

[102] *Dean Witter*, 1998 WL 442456, at *5–6; *accord Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *14 (Del. Ch. Oct. 9, 2007); *Krahmer*, 903 A.2d at 778.

[103] *See Dean Witter*, 1998 WL 442456, at *5–6; *Fike*, 754 A.2d at 261 ("[T]he limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued*, would lead to the discovery of the injury." (internal quotation marks omitted) (emphasis in original)).

[104] *See Fike*, 754 A.2d at 261.

not, therefore, have any basis or obligation to inquire whether MacAndrews AMG was properly managing the GEP business. Renco's position calls three separate questions: (1) whether the discovery rule applies because Renco's injury was inherently unknowable; (2) whether MacAndrews AMG's status as a fiduciary implicates equitable tolling; and (3) if the answer to either of those questions is yes, when (if ever) was Renco on inquiry notice of its ER&D and transfer pricing claims? Because I conclude that the answers to the first two questions are "no," I need not reach the third.

### 1. Renco's Alleged Injuries Were Not Inherently Unknowable

In *Krahmer v. Christie's Inc.*, this court undertook a thorough review of Delaware's inherently unknowable injury exception.[105] The court traced the exception to *Layton v. Allen*, where the Supreme Court of Delaware tolled the statute of limitations for a medical malpractice claim brought seven years after a doctor, unbeknownst to the patient, left a surgical instrument in the patient's body.[106] The inherently unknowable injury sustained by the blamelessly ignorant plaintiff in *Layton* was, quite literally, impossible to uncover.[107]

---

[105] 903 A.2d 773, 778–80 (Del. Ch. 2006).

[106] *Id.* at 779.

[107] *Id.* The court in *Layton* noted that its purpose was to "create a separate exclusion that was to apply only in the narrow circumstances which involve an inherently unknowable injury sustained by a blamelessly ignorant plaintiff." *Id.*

35

Over time Delaware courts have expanded the doctrine and have applied it in instances where the plaintiff's injury went undetected as a result of his "justifiable reliance on a professional or expert whom [he had] no ostensible reason to suspect of deception," even when affirmative inquiry or investigation may have revealed the injury.[108] For example, our courts have found inherently unknowable injuries where: a client did not know his accountant committed malpractice in the preparation of tax returns until the Internal Revenue Service came knocking;[109] a landowner did not know his plumber had performed faulty work until his septic system malfunctioned;[110] and a warehouse owner did not know his roofing contractor had installed a defective roof until the roof failed.[111] In each of these cases Delaware courts tolled the statute of limitations because the plaintiffs were demonstrably unaware of the injury they had sustained at the hands of contractors or consultants they had every reason to trust not to injure them.

The relationship between Renco and MacAndrews AMG hardly fits this mold. Indeed, Renco had ample opportunity and incentive to discover precisely the sort of injury it now alleges it has suffered as a result of MacAndrews AMG's

---

[108] *Dean Witter*, 1998 WL 442456, at *5; *see also Krahmer*, 903 A.2d at 779–80.

[109] *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank*, 330 A.2d 130, 131 (Del. 1974).

[110] *See Rudginski v. Pullella*, 378 A.2d 646, 649 (Del. Super. 1977).

[111] *See Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 650–51 (Del. Super. 1985).

breach of the Holdco Agreement. Both Renco and MacAndrews AMG were sophisticated businesses who approached their joint venture at arm's length with equal bargaining power.[112] During negotiations, Renco suspected MacAndrews AMG might mismanage the venture to its benefit and insisted that the Holdco Agreement contain protective measures that would make MacAndrews AMG accountable.[113] Renco secured broad inspection rights of Holdco's books and records and a covenant that MacAndrews AMG would make regular disclosures to each member.[114] With these protections in hand, Renco cannot be heard to argue that discovery of the facts supporting its breach claims regarding the ER&D costs and transfer pricing was a "practical impossibility."[115]

Not surprisingly, Renco seeks to minimize the contractual tools at its disposal to uncover wrongdoing by arguing that MacAndrews AMG failed to provide information and make records available for inspection as required by the Holdco Agreement. Even if true, these failures to provide information do not render that information inherently unknowable. From the outset of the parties' relationship, Renco closely monitored its stake in the venture through

---

[112] SAC ¶ 28 (describing "a long and complicated negotiation involving teams of lawyers, accountants and financial professionals on each side").

[113] *Id.* ¶¶ 37–38.

[114] Holdco Agreement § 10.1.

[115] *Dean Witter*, 1998 WL 442456, at *5.

investigations conducted by an independent accounting firm and its own direct contact with MacAndrews & Forbes affiliates.[116] Renco does not allege that MacAndrews AMG fraudulently concealed or misstated information Renco requested during the course of these investigations. Instead, Renco asserts that MacAndrews AMG repeatedly denied Renco's requests for information.[117] If true, Renco had recourse under the Holdco Agreement to enforce its rights to obtain information. More importantly, at the moment MacAndrews AMG refused Renco's demands that it provide information as required by the Holdco Agreement, Renco no longer could assume "blamelessly ignorant" status for purposes of invoking the time of discovery tolling exception.[118] Renco's injuries, to the extent they existed and were caused by MacAndrews AMG, were hardly inherently unknowable as contemplated by *Layton* and its progeny.

## 2. Equitable Tolling Does Not Apply

"Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a

---

[116] *See supra* notes 38–44 and accompanying text.

[117] SAC ¶¶ 2, 48, 119.

[118] *Dean Witter*, 1998 WL 442456, at *5.

38

fiduciary."[119] This tolling exception aims "to ensure that fiduciaries cannot use their own success at concealing their misconduct as a method of immunizing themselves from accountability for their wrongdoing."[120] Renco argues that it reasonably relied on the good faith of MacAndrews AMG, a fiduciary by virtue of its position as Holdco's managing member, to manage the GEP business in a manner that was consistent with the Holdco Agreement and the best interests of all members. Whether equitable tolling applies in this instance hinges on whether MacAndrews AMG is, in fact, Renco's fiduciary.

Holdco is a Delaware limited liability company.[121] While managing members of a Delaware LLCs may owe default fiduciary duties,[122] the LLC Act enables contracting parties to alter and even eliminate equitable fiduciary duties in the LLC context.[123] MacAndrews AMG points to a network of contractual duties

---

[119] *Id.* at *6; *see also Forsythe*, 2007 WL 2982247, at *14.

[120] *In re American Int'l Gp. Inc.*, 965 A.2d 763, 813 (Del.Ch. 2009).

[121] Holdco Agreement at 1 (invoking the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-101 *et seq.*) ("the LLC Act")).

[122] *Feely v. NHAOCG, LLC*, 62 A.3d 649, 660–61 (Del. Ch. 2012) (citing *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1217–18 (Del. 2012)).

[123] 6 *Del. C.* § 18-1101(c); *accord Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 849 (Del. Ch. 2012), *aff'd sub nom. Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206 (Del. 2012) ("LLC agreements may displace fiduciary duties altogether or tailor their application . . . ."); *see Zimmerman v. Crothall*, 62 A.23d 676, 703 (Del. Ch. 2013) (holding that "the parties, through [the LLC at issue's operating agreement] and consistent with their prerogative under 6 Del. C. § 18-1101(c), [had] 'restricted' the

established in the Holdco Agreement that it contends supersedes any fiduciary duties it may have owed to Renco. Within that network, MacAndrews AMG cites specifically to Section 12.3(a), which provides, in its entirety:

> Without limiting any other provisions hereof, to the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they **restrict the duties** and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to **replace such other duties** and liabilities of such Covered Person.[124]

This Court already determined in this litigation that Section 12.3(a) could not be reconciled with Renco's breach of fiduciary duty claim against MacAndrews AMG—a claim that was grounded in the same factual allegations of self-dealing Renco has again raised in its opposition to this motion:

> Under common law precedent (and a plain reading of Section 12.3(a)), the **Holdco Agreement provisions supersede the fiduciary duties that otherwise might apply to the conduct challenged here**. The Holdco Members chose to govern their relationship with a complex, negotiated agreement. If Defendants have violated any of Plaintiff's rights, the Holdco Members' agreement—not some general duty of loyalty or care—governs the remedy to which Plaintiff is entitled. Thus, the fiduciary duty claims

---

fiduciary duties that the Director Defendants owed in the context of their dealings with the Company").

[124] Holdco Agreement § 12.3(a) (emphasis added).

against MacAndrews AMG as managing member, and [MacAndrews & Forbes] and Perelman as controllers, are all dismissed.[125]

It is true, as Renco points out, that the Court stopped short of holding that MacAndrews AMG does not act as a fiduciary with regard to Holdco in a broader sense.[126] Nevertheless, the Court's determination that provisions within the Holdco Agreement replaced any fiduciary duties that might have governed MacAndrews AMG's management of the capital accounts or the GEP Business is now law of the case.[127] As relates to the statute of limitations, this means Renco cannot claim it was entitled to rely on MacAndrews AMG's competence and good faith as a fiduciary as a basis to invoke equitable tolling, particularly with regard to conduct this Court already has determined did not implicate fiduciary duties.

F. **Relation Back**

Renco's final tolling argument applies only to its transfer pricing claim, which was first raised in the Second Amended Complaint filed on February 7, 2014. Renco argues that this claim should relate back to the date of the original

---

[125] *Renco*, 2015 WL 394011, at *8 (emphasis added). The Court went on to dismiss aiding and abetting claims asserted against MacAndrews & Forbes and Perelman "for lack of an underlying fiduciary breach." *Id.*

[126] Answering Mem. 39 n.9.

[127] "The 'law of the case' doctrine requires that issues already decided by the same court should be adopted without relitigation, and once a matter has been addressed in a procedurally appropriate way by a court, it is generally held to be the law of that case and will not be disturbed by that court unless a compelling reason to do so appears." *May v. Bigmar, Inc.*, 838 A.2d 285, 288 n.8 (Del. Ch. 2003).

complaint under Court of Chancery Rule 15(c)(2), which provides that "[a]n amendment of a pleading relates back to the date of the original pleading when the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading."[128]

In *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, this court held, for relation back purposes, that "a separate independent violation of the same contract provision does not 'arise' out of the same conduct, transaction or occurrence as did the first, unrelated violation."[129] Renco's original complaint does not infer, much less allege, that MacAndrews AMG breached the Holdco Agreement by causing GEP to sell AM General 6.5L Diesel Engines for inappropriately low prices. Indeed, the original complaint makes no mention of transfer pricing at all. Consequently, the transfer pricing claim cannot relate back.

## IV.   CONCLUSION

Renco has failed to demonstrate that any material issue of fact exists with regard to the accrual of its breach of contract claims relating to management fees, royalties, ER&D costs or transfer pricing. Nor has it demonstrated that

---

[128] Ct. Ch. R. 15(c)(2).

[129] 2012 WL 3201139, at *18 (Del. Ch. Aug. 7, 2012) (declining to allow an amended claim of breach of contract to relate back to an earlier claim of breach arising out of the same contractual provision).

Section 8106's three-year statute of limitations may be tolled to allow claims that accrued more than three years prior to the filing of the complaint to proceed. Accordingly, MacAndrews AMG's motion for partial summary judgment must be granted. Judgment will be entered for MacAndrews AMG on Renco's breach of contract and implied covenant claims relating to MacAndrews AMG's wrongful charges of management fees, royalties, and ER&D costs to GEP that occurred before June 29, 2009, and on Renco's similarly styled claims relating to MacAndrews AMG's manipulation of transfer pricing that occurred before February 7, 2011.

**IT IS SO ORDERED.**


_/s/ **Joseph R. Slights III**_
Vice Chancellor